**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SHEPARD, | ) | Case No. 1:25-CV-00955-JPC |
| | ) | |
| Petitioner, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| DOUGLAS FENDER, WARDEN, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | **REPORT & RECOMMENDATION** |

## I.    INTRODUCTION

Petitioner, Robert Shepard ("Mr. Shepard"), seeks a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 1). Mr. Shepard is serving a sentence of 33 years to life in prison after being convicted of aggravated murder, murder, and felonious assault. The victim was the grandson of former Cleveland mayor Frank Jackson. (ECF No. 8-1, Exhibit 10, PageID # 183; ECF No. 8-2, 75:21-76:4).

Mr. Shepard asserts three grounds for relief. Respondent, Warden Douglas Fender ("Warden"), filed an answer/return of writ on October 10, 2025. (ECF No. 8). Mr. Shepard filed a traverse on January 8, 2026. (ECF No. 11). The Warden filed a sur-reply to Mr. Shepard's traverse on January 22, 2026. (ECF No. 12).

This matter was referred to me on May 13, 2025 under 28 U.S.C. § 636(b)(1)(A), Rule 72(a) of the Federal Rules of Civil Procedure, and Local Rule 72.1 to prepare a report and recommendation on Mr. Shepard's petition. (*See* ECF non-document entry dated May 13, 2025). For the reasons set forth below, I recommend that Mr. Shepard's petition be DISMISSED and/or DENIED. However, I also recommend that the Court GRANT Mr.

1

Shepard a certificate of appealability.

## II.   RELEVANT FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, a state court's findings of fact are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, that the state court's factual findings are erroneous. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. The Ohio Court of Appeals for the Eighth Appellate District summarized the facts as follows:

> {¶ 2} On September 19, 2021, the victim was shot and killed on Anita Kennedy Road in Cleveland Metropolitan Housing Authority's ("CMHA") Garden Valley area. Less than two hours before that shooting, a 12-year-old male ("Doe") was shot multiple times at Cleveland's Lonnie Burten Recreation Center and Park ("Burten Center"), an area from which the victim had recently departed. The Cleveland Police Department ("CPD") suspected that the shooter intended to kill the victim at the Burten Center, shot Doe due to mistaken identity, and completed his quest a short while later.
>
> {¶ 3} CPD investigated, and the CPD real time crime center ("RTCC") compiled video footage from Cleveland and CMHA cameras. CPD posited that Shepard aided or abetted the murder of the victim by leaving the victim's dirt bike in a CMHA housing area located on Anita Kennedy Avenue with knowledge that the victim would be shot by others when he appeared to retrieve it. When the victim approached the bike, the shooter exited a silver Chrysler parked on the street in front of the walkway where the state asserted the bike was purposely placed by Shepard. The victim was shot multiple times and died at the scene.
>
> {¶ 4} The defense argued and CPD testimony confirmed, there was no direct evidence to support the elements of the convictions. The defense claimed the evidence demonstrated Shepard was not the shooter and was not at the scene at the time the victim was shot. The defense also contended the state failed to show that Shepard knew the identity of the shooters.
>
> (ECF No. 8-1, Exhibit 8); *State v. Shepard*, No. 112225, 2023 WL 9004430, 2023-

Ohio-4791 (8th Dist. Dec. 28, 2023).

The court provided additional factual background later in the decision:

2

{¶ 16} DaNesha Terrell ("Terrell") testified that she, her mom, and others ran to the Burten Center to check on family and friends after being notified that shots had been fired. Her family was fine, but she saw a young male lying on the ground.

{¶ 17} Terrell ran into the victim who she "practically grew up" with. She could not recall what he was wearing. The victim, who lived in the East 38th Street area about eight blocks from the Burten Center, asked Terrell for a ride to pick up his dirt bike. Terrell and her brother drove the victim to a street called Sidaway Avenue in the Garden Valley area, about a five-minute drive from the Burten Center. The only time the victim used his cell phone was as he exited the car, and Terrell overheard him ask someone "where['s] the bike at?" Tr. 351.

{¶ 18} The victim asked her to wait until he retrieved his bike. Terrell looked at her phone momentarily, saw that her mother was calling, heard shots, and looked up to see the victim on the ground. Terrell quickly pulled away from the area and called 911 and the victim's sister.

{¶ 19} The 9:03 p.m. 911 call was played for the jury (exhibit No. 72). Terrell asked for police assistance for a shooting at East 72d Street and Sidaway Avenue and advised that the shooter was in a gray Chrysler 300 with dark-tinted windows, and was wearing Timberland boots, light blue jeans, a white pullover hoodie, and a yellow face mask. Terrell did not provide her real name due to an outstanding warrant involving a diversion program and was not receiving consideration for her testimony.

{¶ 20} Terrell reviewed the CMHA portions of the CPD/CMHA video compilation (exhibit No. 98). Terrell identified arriving in her mother's car and the victim exiting her car. Terrell pulled her car up in the middle of the street beside the gray Chrysler parked to her left to wait for the victim. She and the driver could not see each other due to the tinted windows. Terrell remained in the spot until the shots were fired. Terrell did not know who the victim talked with when asking about the bike or whether the call was made by the victim or was incoming.

{¶ 21} Terrell's mother Shaunte Hooks ("Hooks") confirmed the encounter with the victim at the Burten Center and that she allowed Terrell to use her car to drop off the victim and stated that she could not recall what the victim was wearing. Terrell later returned home crying that the victim had been shot. Hooks did not see anyone riding a dirt bike that day.

{¶ 22} Janesha Jackson ("Jackson") testified that the victim was her brother with whom she was very close. At about 1:00 p.m., the victim arrived at the stadium parking lot where Jackson and friends were tailgating. They lived on the same street, and Jackson's husband drove Jackson and the victim home about 4:00 p.m. The victim went home, changed clothes, and left for the Burten Center on his dirt bike wearing a black shirt and red Adidas jogging pants. Jackson learned of the shooting when called by Terrell.

3

{¶ 23} Jackson identified the victim's dirt bike in a video frame photograph (exhibit No. 80). The photograph was taken in front of a gas station located at East 55th Street and Woodland Avenue with a time stamp of 7:08 p.m. Jackson said the individual riding the bike was not the victim.

{¶ 24} Sergeant detective Ashley Jaycox ("Det. Jaycox") of the CMHA police department stated the department handles all felonies except homicides, which were handled by the CPD homicide unit. The security camera systems are motion activated though the newer system includes cameras with 24/7 recording. Det. Jaycox provided the CMHA portions of the CPD video. The cameras where the incident occurred only captured activity that was "big enough and close enough to the camera." Tr. 386. The detective had no other involvement with the investigation.

{¶ 25} Dr. Erica Armstrong ("Dr. Armstrong") was employed by the Cuyahoga County Medical Examiner's Office as a forensic pathologist and deputy medical examiner at the time of the incident. Her primary responsibilities were to determine the cause and manner of death.

{¶ 26} The doctor testified that EMS was unable to revive the victim at the scene. Gunshot wounds were located in the right forehead, right temple, upper part of the right arm, back of upper part of right arm, right arm, upper lip, and left back. Testimony was also provided regarding autopsy photographs of the injuries and recovery of bullet fragments. The shots were generally from close range and were the official cause of death.

{¶ 27} Curtiss Jones, supervisor of the trace evidence unit of the Cuyahoga County Medical Examiner's Office, testified that his duties included the collection and analysis of trace evidence such as fibers, hairs, debris, and bullet holes from the decedent's body and clothing. The decedent was wearing a black t-shirt, red sweatpants, underwear, socks, shoes, and a head covering. Samples were transferred to the DNA laboratory for testing.

{¶ 28} CPD detective Robby Prock ("Det. Prock") responded to the scene along with detectives Peoples and Connole. Det. Prock described the photographic exhibits of the scene and evidence markers (exhibit Nos. 1-71). The shooting took place in a walkway area between the townhouse style buildings with decorative fencing located to the left and right of the walkway. The dirt bike was behind the fence portion to the right. The walkway extended from Anita Kennedy Avenue to the parking lot behind the buildings. DNA swabs were taken from four Sellier and Bellot .40 caliber Smith & Wesson casings, one Blazer .40-caliber Smith & Wesson casing, the dirt bike, and cell phone collected at the scene. A gas can that detectives were advised could be relevant to the investigation was also swabbed.

{¶ 29} The shooting occurred five to six feet from the first-floor window of the townhouse unit to the right of the building, and an occupant would potentially have heard the encounter. Det. Prock estimated that the gas can was located 8 to 12 housing units from the scene.

{¶ 30} CPD detective Kevin Warnock ("Det. Warnock") with the gang impact unit responded to the scene while it was being secured. He and other CPD personnel interviewed residents and bystanders and canvassed the area for witnesses. Generally, people did not want to be seen cooperating with police or simply refused to speak. CPD initially believed the victim was the "sole operator of the bike throughout the incident." Tr. 498. Information was received that he was not. The gas can was recovered from the residence of Kimberlie Davis who police interviewed twice. Based on the interviews, Shepard became a person of interest

{¶ 31} Kimberlie Davis ("Davis") reluctantly testified that she knew Shepard through her friend who had a child with Shepard. Davis initially advised police that Shepard had touched the gas can that police took as evidence. Shepard was at the house while it was light outside, and Davis gave him something to eat. Davis stated she did not see Shepard with the bike and later said she only saw Shepard with the bike during the day.

{¶ 32} During cross-examination, Davis added that Shepard was cool and calm during the visit and came alone. The gas can that was recovered by CPD belonged to her, but she did not know whether the can was full or empty when Shepard was there, whether Shepard obtained gas, or whether he returned to her house again that day.

{¶ 33} CPD investigative research analyst Macie Pierse ("Pierse") was employed with the RTCC that assisted with video evidence including creating compilations. Pierse prepared the video compilation exhibit in the instant case. Pierse also authored a report of the camera views that she examined to prepare the compilation, created a map identifying the camera locations, and a list of the 58 video clips selected to complete the video.

{¶ 34} Pierse stated that the time stamps on the CPD video clips were accurate and in sequential time order as much as possible but could not say that the same was true for the motion-activated CMHA clips. Pierse was aware that investigators thought the shootings of the victim and at the Burten Center were related.

{¶ 35} Pierse described the video compilation for the jury. Pierse stated the scene of a male crossing a CMHA parking lot near East 40th and Bohn Avenue was the male who later shot Doe at the Burten Center. Several clips at the beginning of the compilation depicted a black male in a white shirt who was riding the victim's dirt bike in the general area of East 49th Street and Outhwaite Avenue at approximately 7:34 p.m. to 7:46 p.m.

{¶ 36} A clip from a camera located at the East 46th Street entrance of the Burten Center showed the victim walking down East 46th Street at 7:51 p.m. looking at or talking on his cell phone. He was wearing tennis shoes, a black shirt, red sweatpants, and a black hair cap.

{¶ 37} The next clip was of Doe, described by the witness as, "wearing red pants with a white stripe and a white and red or black striped shirt," walking through the baseball

5

field at the Burten Center. Tr. 536. At 7:53 p.m., the victim was walking through the playground area of the Burten Center and interacting with his cell phone. On parallel walkways divided by tall, thick shrubs, the victim was leaving the playground area as Doe entered.

{¶ 38} Also, at 7:53 p.m., the "suspect shooter" was captured by the camera in front of the Burten Center walking down East 46th Street, the same street the victim walked down, as though following the victim. At 7:54 p.m., Doe was walking out of the playground area toward the street when the shooter walked up to him and fired until Doe fell. The shooter ran back up East 46th Street. People began running through the park, including the victim, and gathered near the football field sign. At 7:56 p.m., the gray Chrysler drove through the immediate area and the Scoville Avenue portion of the Burten Center parking lot as others ran from the park to the Outhwaite Homes CMHA property adjacent to the Burten Center.

{¶ 39} At 8:03 p.m., the victim and several others assisted an individual who was also wounded by the gunfire into a red car that was flagged down at East 55th Street and Outhwaite Avenue. Tr. 551. Also, at 8:03 p.m., another clip depicted the Chrysler stopping at the light, then proceeding through the intersection of East 55th Street and Quincy Avenue. The Chrysler proceeded east on Quincy Avenue and, at 8:04 p.m., was at Quincy Avenue and Opportunity Corridor Boulevard.

{¶ 40} The video review shifted to an 8:50 p.m. clip at East 55th Street and Outhwaite Avenue where the dirt bike and alleged rider Shepard were headed toward East 55th Street and Kinsman Avenue. The remaining video was from CMHA motion clips and activities on Anita Kennedy Road at cited points of the 24:10 minute video and focused on the dirt bike rider, the victim, and the Chrysler.

{¶ 41} Pierse described:

> 21:52 – "[W]e are seeing a dirt bike and dirt bike rider that are entering the scene from the west going eastbound."
>
> 22:20 – "[T]he silver Chrysler 300 is driving westbound on Anita Kennedy" "and stopped next to the black vehicle." "Looks like they may have been talking."
>
> 22:28 – "[T]he [Chrysler] vehicle is backing up down the street and it looks like the dirt bike rider is no longer on the dirt bike but is walking next to that [Chrysler] vehicle."

Tr. 561-563.

{¶ 42} The narration continued briefly without video point specifications:

> [T]he vehicle is stopped and it looks like that rider * * * may be speaking with the occupants of the vehicle. * * * The Chrysler has now pulled forward again just out of the view of the camera. * * * The individual in the white t-shirt is now

6

speaking with the black vehicle at the bottom of the screen. * * * It looks like that [black] vehicle opened the back door of that vehicle and then it did disappear from the bottom of the screen.

Tr. 563-564.

{¶ 43} Pierse continued:

22:57 – The silver Chrysler 300 is traveling eastbound on Anita Kennedy * * * [and] was backing into a parking spot on the side of the road right there [indicating]. * * * [A] lighter colored vehicle traveling eastbound on Anita Kennedy, and this is the video—the vehicle that [the victim] was a passenger in.

23:36 – There's a person that's exiting the rear passenger side of that vehicle, and that's believed to be the victim. * * * [The victim] was on the south side of the road when he exited the vehicle and then returned to the north side of the road going in front of that vehicle. * * * So [the victim] goes northbound towards the area in which his dirt bike was later found and we see somebody approach him and extend their arm and shoot.

Tr. 565-567. Pierse was unable to locate the Chrysler in any of the CPD videos after the shooting. The state did not inquire about CMHA videos.

{¶ 44} Pierse confirmed during cross-examination that the video clips did not depict the person riding the dirt bike near the Burten Center around the time of the first shooting incident. She also agreed that the dirt bike rider and black SUV arrived about the same time and came from the same direction. The Chrysler arrived from the opposite direction, and the dirt bike rider eventually entered the SUV and road away. There were no video clips showing where the SUV went. There was a brief interaction of a few seconds between the Chrysler and what appeared to be the person riding the dirt bike. Tr. 583.

{¶ 45} Forensic DNA analyst Christine Scott ("Scott") was employed by the Cuyahoga County Regional Forensic Science Laboratory in the medical examiner's office. She examined evidence for DNA, interpreted the DNA profiles recovered, and prepared reports. Scott examined body swabs from the victim, the victim's clothing, the left- and right-hand handlebar of the dirt bike, casings, and the gas can recovered from the scene. Swabs from parts of the victim's body and clothing indicated a mixture of DNA with the victim's. The handlebars contained a mixture of the victim and four other individuals. An insufficient amount of DNA was obtained from the gas can and bullet casings. A DNA match with Shepard was identified on the left and right handlebar of the dirt bike.

{¶ 46} Edward Lattyak ("Lattyak") was the supervisor of the firearms and toolmark unit of the Cuyahoga County Medical Examiner's regional forensic science laboratory. Lattyak examined the bullet casings, a fired bullet, and several bullet fragments. He concluded that the bullets were fired from a Glock firearm but no firearm was submitted. Examination of the National Integrated Ballistic Information Network

7

database revealed a potential match for one of the bullet casings that indicated the same weapon may have been used in several other shooting events but none on the same day.

{¶ 47} Special Agent Andrew Burke ("Agent Burke") of the Federal Bureau of Investigation was assigned to the CPD Homicide Unit's Violent Crime Task Force. Agent Burke performed a forensic software download of data from two iPhones that belonged to the victim. One phone had very little call activity, no data for the period of the shooting, and no references to Shepard. The other phone with a number ending in 1523 appeared to be the victim's primary phone. The investigation focused on data for the period of September 19-23, 2021.

{¶ 48} The shooting occurred "around 9:10 p.m." Tr. 628. Seven consecutive outgoing calls were made by the victim to the same number ending in 9510 between 8:49 p.m. and 9:03 p.m. The 8:53 p.m. and 8:55 p.m. calls lasted a minute and 12 seconds, and the others may not have connected, including the last call at 9:03 p.m. The 9510 number called the victim's 1523 number two days before the shooting.

{¶ 49} CPD attempted to identify the owner of the 9510 number. There was no name associated with the number in the victim's phone, no text message exchanges, and no text references to Shepard. A subpoena to the phone provider revealed there was no subscriber name listed for the 9510 prepaid phone account. However, phone records were secured for 9510 and reviewed for call patterns during the relevant time frame.

{¶ 50} A search was conducted of the Securus jail-phone records for calls made by Shepard to numbers of interest selected from the call pattern reviews. Six calls were discovered from Shepard to a number ending in 1949 between November 11 and December 27, 2021, a number that also appeared in the 9510 records (exhibit No. 159). Shepard also made calls that appeared in the 9510 phone records to numbers ending in 8220 and 4520 (exhibit Nos. 160, 161).

{¶ 51} Agent Burke confirmed during cross-examination that there were no incoming calls to the victim from the 9510 number the day of the shooting. There also was no evidence of who possessed the 1949, 2220, and 4520 numbers at the time Shepard called them. And there was no direct evidence that Shepard owned the 9510 phone.

{¶ 52} Detective Shane Bauhof ("Det. Bauhof") of CPD's Fourth District Homicide Unit worked on the case with detectives Gonzalez and Diaz. Through canvassing by the CPD gang-impact unit and CMHA, along with videos provided by CMHA, Det. Bauhof "learned of a subject that delivered [the victim's] dirt bike to the area and * * * why [the victim] was instructed to go to Garden Valley [by East 70th Street and Kinsman Avenue] to pick up his dirt bike" though the victim lived in the East 38th Street area. Tr. 673. At that point, Shepard was suspected of being the dirt bike rider.

{¶ 53} Det. Bauhof narrated his perspective of the CMHA motion-activated camera portion of the video compilation that echoed the perspectives presented by Pierse of the events at the Burten Center and on Anita Kennedy Road where the victim's

shooting occurred. The detective later in his testimony identified the bike rider as Shepard in video excerpts and still shots of the video.

{¶ 54} Det. Bauhof added that CPD was unable to identify the license plates on the black SUV and Chrysler and that when the Chrysler backed up beside the bike rider, there appeared to be a brief conversation and a gesture by the bike rider toward the place where the bike had been left. The Chrysler parked directly in front of that area. Police assumed the shooter entered the Chrysler, which pulled off quickly afterward.

{¶ 55} Det. Bauhof also testified regarding still shots of the video scenes including Doe, Doe's shooter, and the victim at the Burten Center. The similarity of the attire between Doe and the victim and the presence of the Chrysler near the Burten Center bolstered the conclusion that Doe was a victim of mistaken identity and that the victim was the target.

{¶ 56} CPD received tips regarding the Chrysler that had a distinctive oversized sunroof. A tip directed CPD to an individual named Cam who had a Chrysler 300 but disposed of it after the shooting. A picture secured from social media was identified by the gang-impact unit as Rashad Bilal ("Bilal") who owned a light blue Chrysler 300 that fit the description. Bilal was the target of a narcotics investigation. Despite efforts including checking CPD's street license reader records, the Chrysler was not located.

{¶ 57} Cell phone records revealed calls to and from Bilal and the 9510 number CPD attributed to Shepard on multiple days prior to the shooting. The day of the shooting, Bilal called 9510 at 7:36 p.m., which was shortly before the Burten Center shooting at 7:45 p.m., again at 8:08 p.m., and at 3:39 a.m., the morning after the shooting (exhibit Nos. 155 and 181.) Records show calls were made from the 9510 number to Bilal on September 16, the day of the shooting, at 2:46 p.m., 5:52 p.m., and 8:08 p.m.

{¶ 58} Det. Bauhof also testified that the date September 16, 2021, became significant because that was the date that James Greathouse ("Greathouse") was either indicted or a warrant was issued for arson in connection with a homicide. The arson was for a "vehicle that listed back to" the victim. Tr. 716. At the time of the victim's shooting, Greathouse was in Texas. The detective said cell phone records for the 9510 number and for Bilal contained calls with a Texas area code. Police determined that Shepard, Bilal, and Greathouse were associates but were unable to identify the owner of the Texas phone.

{¶ 59} During cross-examination, the defense emphasized that the evidence was circumstantial and based on the state's speculation. Bilal was not identified as the driver of the Chrysler and was still considered a suspect in the shooting but had not been arrested or charged at the time of trial. CPD also provided no proof that the car was titled to Bilal. The investigation was still pending at the time of trial.

{¶ 60} The state rested; the defense motion for judgment of acquittal under Crim.R. 29 was denied. The defense rested, and the renewed Crim.R. 29 motion was denied.

9

*Id.*

## III.  PROCEDURAL HISTORY

### A.  State Court Conviction

On November 4, 2021, Mr. Shepard was indicted in the Cuyahoga County Court of Common Pleas on: (1) one unspecified-felony count of aggravated murder in violation of O.R.C. § 2903.01(A); (2) one unspecified-felony count of murder in violation of O.R.C. § 2903.02(B); (3) one second-degree felony count of felonious assault in violation of O.R.C. § 2903.11(A)(1); and (4) one second-degree felony count of felonious assault in violation of O.R.C. § 2903.11(A)(2). (ECF No. 8-1, Exhibit 1). Each count also carried one- and three-year firearm specifications. *Id.* The victim was the grandson of former Cleveland mayor Frank Jackson. (ECF No. 8-1, Exhibit 10, PageID # 183; ECF No. 8-2, 75:21-76:4).  On November 8, 2021, Mr. Shepard pled not guilty to all charges. (ECF No. 8-1, Exhibit 2).

The case proceeded to trial. On November 1, 2022, the jury found Mr. Shepard guilty on all counts. (ECF No. 3). On November 15, 2022, the trial court merged the convictions on counts two through four into the aggravated murder conviction on count one, and sentenced Mr. Shepard to an aggregate term of life with the possibility of parole in 33 years. (ECF No. 4).

### B.  Direct Appeal

On December 14, 2022, Mr. Shepard, through new counsel, timely filed a notice of appeal to the Eighth Appellate District. (ECF No. 8-1, Exhibit 5). In his appellate brief, Mr. Shepard raised the following assignments of error:

1. The trial court erred when it denied appellant's motion for acquittal under Crim.R.29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

2. Appellant's convictions are against the manifest weight of the evidence.

10

3. The court erred by allowing the State to elicit inadmissible hearsay testimony from the witnesses over defense objection and depriving appellant of due process and a fair trial in violation of his federal and state constitutional rights.

(ECF No. 8-1, Exhibit 6).

On December 28, 2023, the Eighth Appellate District affirmed. (ECF No. 8-1, Exhibit 8). On February 12, 2024, Mr. Shepard, through counsel, timely filed a notice of appeal to the Ohio Supreme Court. (ECF No. 8-1, Exhibit 9). In his memorandum in support of jurisdiction, Mr. Shepard raised the following propositions of law:

1. The holding in *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, does not permit the State to introduce both testimonial and bad acts evidence of unindicted individuals for the truth of those allegations in order to establish a theory of complicity.

2. Insufficient evidence exists to maintain a conviction for aggravated murder where the conviction is based solely on the speculative circumstantial evidence of an untested cell phone record analysis that does not establish that the defendant ever even knew that a crime was going to occur, or in any way advanced the goals achieving the victim's death.

(ECF No. 8-1, Exhibit 10). On May 13, 2024, the Ohio Supreme Court declined to accept jurisdiction of Mr. Shepard's appeal. (ECF No. 8-1, Exhibit 11). Three justices dissented, with Justice Donnelly writing a dissenting opinion. (ECF No. 8-1, Exhibit 12). Justice Donnelly expressed a concern that the jury may have "fill[ed] in gaps with guesswork." *Id*. at ¶ 4. Justice Donnelly further questioned whether the State had proved the elements of the relevant offenses beyond a reasonable doubt. *Id*. at ¶¶ 7-8. Justice Donnelly stated that he "d[id] not allege that Shepard is innocent" and had "no basis on which to reach that conclusion," but that he was "concerned that speculation in this case has been mistaken for circumstantial evidence and that Shepard has received a life sentence based solely on that speculation." *Id*. at ¶ 9.

On May 24, 2024, Mr. Shepard filed a motion for reconsideration. (ECF No. 8-1,

11

Exhibit 13). On May 30, 2024, the Ohio Supreme Court *sua sponte* struck Mr. Shepard's motion as untimely. (ECF No. 8-1, Exhibit 14).

### C.  Federal Habeas Action

On May 12, 2025, Mr. Shepard, through counsel, filed his 28 U.S.C. § 2254 habeas petition. (ECF No. 1). Mr. Shepard's habeas petition raises three grounds for relief:

1. The admission of non-testifying, out-of-court testimonial statements from unknown witnesses violated Petitioner's rights under the Sixth and Fourteenth Amendments.

2. Violation of Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments by the admission of other acts evidence committed by unindicted persons not related to the criminal offense.

3. The conviction was based on legally insufficient evidence which resulted in a violation of Petitioner's right to due process.

*Id*. On October 10, 2025, the Warden filed an answer/return of writ. (ECF No. 8). Mr. Shepard filed a traverse on January 8, 2026. (ECF No. 11). The Warden filed a sur-reply to Mr. Shepard's traverse on January 22, 2026. (ECF No. 12).

## IV. STANDARDS OF REVIEW AND GOVERNING LAW

### A.  Jurisdiction

28 U.S.C. § 2254(a) authorizes this court to entertain an application for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him[.]" 28 U.S.C. § 2241(d). The Cuyahoga County Court of Common Pleas sentenced Mr. Shepard, and the Court takes judicial notice that  Cuyahoga County is within this Court's geographic jurisdiction.

12

Accordingly, this Court has jurisdiction over Mr. Shepard's § 2254 petition.

## B.  Exhaustion and Procedural Default

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court can review a petition for a writ of habeas corpus on the merits. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806. In determining whether there has been a procedural default, the federal court looks to the last explained state-court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

13

A claim is fairly presented when it has been asserted as a federal constitutional issue at every stage of the state court review process. *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010); *Williams*, 460 F.3d at 806.

The Sixth Circuit has developed a four-part test to determine whether a procedural default precludes a federal court from reaching a petitioner's claim: (1) whether there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with; (2) whether the state court "actually enforced" the state procedural rule; (3) whether the rule is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the procedural rule and actual prejudice from the alleged constitutional error. *Barton v. Warden, Southern Ohio Corr. Facility*, 786 F.3d 450, 464 (6th Cir. 2015) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). These factors are commonly known as the "*Maupin*" factors.

As the fourth *Maupin* factor indicates, if a procedural default has occurred, the default can be excused and will not preclude consideration of a claim on federal habeas review if the petitioner can demonstrate: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law;" or (2) "failure to consider the claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). A "fundamental miscarriage of justice" can occur only when the procedurally defaulted claim – supported by new reliable evidence not presented at trial – would establish that the petitioner was "actually innocent" of the offense. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

### C. Cognizable Federal Claim

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the

14

ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Glaze v. Morgan,* No. 1:19-CV-02974, 2022 WL 467980, at *4 (N.D. Ohio Jan. 18, 2022) (quoting *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991)). Thus, "errors in application of state law . . . are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.").

A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quotation omitted). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).

### D. **AEDPA Standard of Review**

28 U.S.C. § 2254, as amended by AEDPA, provides in relevant part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(*Id.*)

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id.*

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the

16

evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

For state prisoners, the § 2254(d) standard "is difficult to meet . . . because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* at 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents" and "goes no further." *Id.* Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## V.  ANALYSIS

Mr. Shepard asserts three grounds for relief, alleging that: (1) the trial court violated his rights under the Confrontation Clause of the Sixth Amendment; (2) the trial court admitted evidence of unrelated criminal acts allegedly committed by other unindicted individuals in

17

violation of his due process rights; and (3) his conviction was based on legally insufficient evidence. The Warden argues that Mr. Shepard procedurally defaulted on his first two grounds for relief and that all three grounds for relief are not cognizable and/or fail on the merits.

### A. **Procedural Default**

The Warden first argues that Mr. Shepard procedurally defaulted on his first two grounds for relief because, while he raised those claims in his appeal to the Eighth Appellate District, he argued them purely as questions of state law.

"[F]ederal courts ordinarily may not 'consider a claim in a *habeas* petition that was not "fairly presented" to the state courts' absent cause and prejudice to excuse the procedural default." *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 751 (6th Cir. 2021) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). "To determine whether a petitioner has fairly presented a claim in state court, [a court] ask[s] whether the petitioner: (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law." *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (citing *McMeans*, 228 F.3d at 681).

In his third assignment of error before the Eighth Appellate District, Mr. Shepard argued that the trial court erred in permitting the State to elicit inadmissible hearsay testimony in violation of his federal and state constitutional rights, including his right to due process. (ECF No. 8-1, Exhibit 6). The Warden concedes that Mr. Shepard's third assignment of error generally maps onto Mr. Shepard's first and second grounds for relief in this proceeding. The Warden argues, however, that Mr. Shepard did not fairly present either claim to the Eighth

18

Appellate District because he argued his third assignment error as a question of state evidentiary law rather than relying on federal constitutional principles. The Warden notes that Mr. Shepard did not reference the Confrontation Clause and did not cite to any federal cases employing a constitutional analysis. Instead, he argued that the court "err[ed] by allowing the state to introduce hearsay evidence in violation of Evid. R. 801 and Evid. R. 403." *Id*. at PageID # 98. The Warden also argues that Mr. Shepard's general references to federal constitutional and due process rights in his assignment of error was insufficient to present his first two grounds for relief.

Mr. Shepard makes two arguments in response. First, he argues that he fairly presented his claims because he referenced his constitutional rights and cited to *State v. Ricks*, 136 Ohio St. 3d 356, 995 N.E.2d 1181 (2013), which itself relied on a number of federal cases and expressly addressed a federal Confrontation Clause issue. Second, he says that he fairly presented his claims because he raised them as federal constitutional arguments in his petition to the Ohio Supreme Court.

Whether Mr. Shepard fairly presented his first two grounds for relief is something of a close question. The Warden is correct that, "[w]hile a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated.'" *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (quoting *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004) (cleaned up)). It is also true that Mr. Shepard primarily argued that the admission of inadmissible hearsay violated Ohio evidentiary rules, rather than the Confrontation Clause or the federal due process clause.

However, Mr. Shepard's argument before the Eighth Appellate District—namely, that

19

the State was allowed to present a speculative theory of the case through inadmissible hearsay—largely mirrors his arguments in his first two habeas grounds for relief. Mr. Shepard is also correct that he cited to *Ricks*, a case that dealt primarily with the Confrontation Clause.

While Mr. Shepard's arguments are not without some merit, I ultimately conclude that he did not fairly present his first two grounds for relief to the Eighth Appellate District. Mr. Shepard's brief, generic references to federal constitutional principles in his third assignment of error cannot trump the fact that his argument focused on state evidentiary rules, including Ohio Rule of Evidence 403(A). Notably, the Eighth Appellate District also largely focused on whether the challenged testimony constituted hearsay under state law and did not reference the Confrontation Clause at all. (ECF No. 8-1, Exhibit 8, ¶¶ 74-87).

In addition, while *Ricks* primarily dealt with the Confrontation Clause, Mr. Shepard did not rely on *Ricks*' Confrontation Clause analysis. Instead, he cited *Ricks* for the proposition that testimony ostensibly offered to explain police conduct becomes inadmissible hearsay if the testimony is more prejudicial than probative. (ECF No. 8-1, Exhibit 6, PageID # 127). Because Mr. Shepard cited *Ricks* for state law principles rather than for its federal constitutional analysis, his citation to *Ricks* did not fairly present his claims. *See Abshear v. Moore*, 354 F. App'x 964, 968 (6th Cir. 2009) (holding that petitioner did not fairly present claim by citing to state case employing federal analysis where petitioner "cited the case only to establish a legal proposition that was concerned exclusively with state statutory law").

It is also not relevant that Mr. Shepard arguably presented his first two grounds for relief as federal constitutional claims to the Ohio Supreme Court because a defendant's failure to fairly present a claim to the state appellate court results in a procedural default, even if the defendant subsequently attempted unsuccessfully to present the claim to the Ohio Supreme

20

Court. *See Wynn v. Fender*, No. 3:21-CV-02405-JG, 2024 WL 3607572, at *8 (N.D. Ohio Apr. 18, 2024), *report and recommendation adopted*, 2024 WL 3606381 (N.D. Ohio July 31, 2024) ("As the Sixth Circuit has explained, 'the Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals'") (quoting *Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir. 1985)); *Monaco v. Forshey*, No. 5:24-CV-01271-CAB, 2025 WL 383458, at *18 (N.D. Ohio Feb. 4, 2025) (report and recommendation) (holding that petitioner failed to fairly present claim where petitioner presented it as federal constitutional question before Ohio Supreme Court but not before state appellate court). Thus, while the question is somewhat uncertain, I conclude that Mr. Shepard has procedurally defaulted on his first two grounds for relief.

Mr. Shepard's procedural default can be excused if he shows either cause for the default and resulting prejudice or that he is actually innocent of the offenses for which he was convicted. *Coleman*, 501 U.S. at 750. Mr. Shepard argues that any procedural default should be excused because he is actually innocent. However, he has not come forth with new, reliable evidence not presented at trial showing that he was actually innocent of the offenses and thus cannot rely on the actual innocence exception to excuse his default. *Schlup*, 513 U.S. at 324. Accordingly, I recommend that the Court dismiss Mr. Shepard's first two grounds for relief as procedurally defaulted. Out of an abundance of caution, however, I will address each of Mr. Shepard's claims on the merits as well.

### B. Merits

#### 1. Ground One: Confrontation Clause

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court has "held that this bedrock procedural guarantee applies to both

21

federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The Confrontation Clause also applies both to in-court testimony and to out-of-court statements introduced at trial. *Id*. at 50-52.

If a hearsay statement is testimonial, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id*. at 68. Thus, after *Crawford*, "[t]he Confrontation Clause bars the admission of out-of-court testimonial statements made by an unavailable witness when those statements are offered to prove the truth of the matter asserted and when the defendant did not have a previous opportunity to cross-examine the witness." *Berry v, Capello*, 576 F. App'x 579, 585 (6th Cir. 2014) (citing *Crawford*, 541 U.S. at 53-54).

Mr. Shepard argues that his Confrontation Clause rights were violated because the State "introduce[d] the purported crimes of two purported criminals through hearsay statements," and because witnesses "were permitted to testify to salacious and explosive out-of-court statements made by other people about crimes and conduct not even directly related, if at all, to Mr. Shepard." (ECF No. 11, PageID # 1140). Mr. Shepard further asserts that detectives "were able to testify that Mr. Shepard was acquainted with a person who committed serious drug dealing offenses and, in another instance, Mr. Shepard was purportedly acquainted with another individual who is a known arsonist and murderer." *Id*.

It is not obvious that the testimony at issue raises any sort of Confrontation Clause problem. In *Crawford*, the Supreme Court held that the Confrontation Clause applies only to statements that are "testimonial," meaning statements that involve "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id*. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). Mr. Shepard argues

22

that detectives were permitted to testify about Mr. Shepard's alleged affiliation with Mr. Bilal and Mr. Greathouse, and he apparently assumes that the detectives' testimony was based on out-of-court statements from unknown individuals. But he has not identified any particular piece of testimony that relayed an out-of-court, testimonial statement. Nor has he shown that the detectives' testimony could only have come from such statements.

Even assuming that detectives were relaying out-of-court testimonial statements, however, Mr. Shepard has not shown that his rights under the Confrontation Clause were violated. "[A] testimonial statement doesn't automatically trigger the Confrontation Clause." *Reed v. May*, 134 F.4th 455, 460 (6th Cir. 2025). "For the Clause's protections to kick in, the statement must also have been hearsay," meaning it must be "an out-of-court statement introduced for the 'truth of the matter asserted' in the statement." *Id*. (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974)). "The Confrontation Clause simply doesn't apply to 'the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Id*. (quoting *Crawford*, 541 U.S. at 60 n.9).

The Eighth Appellate District held that the detectives' testimony was admissible "to establish Det. Bauhof's investigation of the events and individuals involved in the shooting of the victim." (ECF No. 8-1, Exhibit 8, ¶ 86). The Eighth Appellate District's holding was not contrary to or an unreasonable application of clearly established law. Indeed, the Sixth Circuit has held that providing background on a police investigation is a legitimate non-hearsay purpose. *See Reed*, 134 F.4th at 461 (holding that out-of-court statement was not hearsay when the statement "was admitted to explain *why* the police searched the roof . . . a valid, non-hearsay purpose"); *see also Monroe v. Bunting*, No. 1:12 CV 1117, 2013 WL 4592182, at *18 (N.D. Ohio Aug. 27, 2013) ("In some circumstances, out-of-court statements

23

not offered for the truth of the matter asserted, but for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay."); *Addison v. Smith*, No. 1:10 CV 2512, 2012 WL 8009381, at \*11 (N.D. Ohio Dec. 14, 2012), *report and recommendation adopted*, 2013 WL 1855962 (N.D. Ohio Apr. 30, 2013) ("the Sixth Circuit, post-*Crawford*, has concluded that the Confrontation Clause does not bar the use of out-of-court statements 'offered for the limited purpose of explaining why a government investigation was undertaken'") (quoting *United States v. Gibbs*, 506 F.3d 479, 486-87 (6th Cir. 2007)).

Mr. Shepard argues that the State's asserted purpose for introducing the statements was pretextual and that the State actually introduced them to prove the truth of the matter asserted—*i.e.*, that Mr. Shepard was affiliated with Mr. Bilal and Mr. Greathouse; that Mr. Bilal and Mr. Greathouse had a motive to kill the victim; and that Mr. Shepard helped set the victim up for the murder.

There is some merit to Mr. Shepard's argument. It is troubling that detectives were able to introduce the identity of Mr. Bilal and Mr. Greathouse—and to permit the jury to draw the inference that those individuals were involved in the murder—under the guise of providing investigative background and without clear evidence tying either individual to the crime. If I were deciding this issue in the first instance, I might conclude that the stated purported for the testimony was pretextual (assuming the testimony was, in fact, hearsay). *See Gover v. Perry*, 698 F.3d 295, 307 (6th Cir. 2012) (noting that "providing 'background of a police investigation' has been rejected as a valid nonhearsay purpose in some instances" and that the risk of prejudice from admitting an out-of-court statement that a defendant was engaged in specific criminality "'cannot be justified simply to set forth the background of the

24

investigation'") (quoting *United States v. Mancillas*, 580 F.2d 1301, 1310 (7th Cir, 1978)).

I am not considering Mr. Shepard's claims in the first instance, however, and his argument founders on AEDPA's standard of review. While fairminded jurists could come to different conclusions, it was not unreasonable for the Eighth Appellate District to conclude that detectives' testimony was introduced to explain the background of the investigation rather than for the truth of the matter asserted. *See Reed*, 134 F.4th at 461-463 (holding that there is no clearly established federal law adopting the proposition that admission of hearsay testimony under a pretextual non-hearsay justification violates a defendant's rights); *Gover*, 698 F.3d at 307 (holding that, applying AEDPA deference, it was not unreasonable for state appellate court to conclude that testimony was introduced for valid non-hearsay purpose of explaining background to investigation even if others could have disagreed with that conclusion). And, because non-hearsay testimony "does not implicate any Sixth Amendment concerns such as those raised in *Crawford*," *United States v. Kenney*, 218 F. App'x 380, 385 (6th Cir. 2007), Mr. Shepard's Confrontation Clause argument fails. I therefore alternatively recommend that the Court deny Mr. Shepard's first ground for relief on the merits.

That being said, Mr. Shepard's Confrontation Clause arguments are not frivolous. It is true that detectives were permitted to testify regarding relationships Mr. Shepard allegedly had with Mr. Bilal and Mr. Greathouse without fully explaining the source of their information and whether it came from one or more unidentified third parties. I also believe that fair-minded jurists could disagree with the Eighth Appellate District's conclusion that the detectives' testimony was admitted for the purpose of providing background on the investigation rather than for the purpose of linking Mr. Shepard to individuals who may have carried out the murder.

While I do not believe Mr. Shepard's arguments are sufficient to carry the day given AEDPA's deferential standard of review, I do believe his arguments have enough force that he should be permitted to pursue them further. As a result, I recommend that the Court grant Mr. Shepard a certificate of appealability with respect to his Confrontation Clause claim.

### 2. *Ground Two: Admission of Other Bad Acts*

In his second ground for relief, Mr. Shepard argues that his due process rights were violated because the trial court permitted witnesses to testify regarding unrelated crimes that Mr. Bilal and Mr. Greathouse allegedly committed even though the State failed to prove that Mr. Bilal or Mr. Greathouse had any involvement in the murder, let alone that Mr. Shepard assisting them in carrying the murder out. Mr. Shepard argues that the testimony was both irrelevant and unduly prejudicial.

As a general rule, an error of state law in the admissibility of evidence does not constitute an infringement of a right guaranteed under the United States Constitution, and it is not cognizable in habeas corpus. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). However, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Id*.

The Sixth Circuit has cautioned that "courts 'have defined the category of infractions that violate fundamental fairness very narrowly.'" *Bugh*, 329 F.3d at 512 (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)) (cleaned up); *Burger v. Woods*, 515 F. App'x 507, 509-10 (6th Cir. 2013) ("A due process claim premised on a mistaken state court evidentiary ruling faces a steep climb"). Under this standard, state court evidentiary rulings cannot rise to the level of due process violations unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v.*

26

*Egelhoff*, 518 U.S. 37, 43 (1996)). Beyond demonstrating the error resulted in a denial of fundamental fairness, a petitioner seeking habeas relief based on a state-court evidentiary ruling must also establish "actual prejudice" from the admission of the allegedly improper evidence. *Clemmons v. Sowders*, 34 F.3d 352, 357-58 (6th Cir. 1994); s*ee also Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir. 2000).

The Warden argues that Mr. Shepard's claim is not cognizable because he has not identified a Supreme Court decision holding that the admission of prejudicial other acts evidence violates the Due Process Clause. Mr. Shepard counters that the Supreme Court has held exactly that, as reflected in the Supreme Court's recent decision in *Andrew v. White*, 604 U.S. 86 (2025).

In *Andrew*, the defendant was convicted of murdering her husband at a trial where the prosecution introduced evidence about her sex life, prior affairs, and clothing. *Id*. at 88-89. After she was convicted, the defendant sought habeas relief, arguing that the admission of such evidence violated her due process rights and rendered the trial fundamentally unfair. *Id*. at 89-90. The district court denied her petition, and the Tenth Circuit affirmed, holding that the Supreme Court had not clearly established that introduction of unduly prejudicial evidence renders a trial fundamentally unfair. *Id*. at 91.

The Supreme Court reversed, holding that its earlier decisions, including *Payne v. Tennessee*, 501 U.S. 808 (1991), clearly established that the Due Process Clause "'provides a mechanism for relief' against the introduction of evidence 'that is so unduly prejudicial that it renders the trial fundamentally unfair.'" *Id*. at 92-93 (quoting *Payne*, 501 U.S. at 825). The Court also held that the legal principle undergirding *Payne*—that "the Due Process Clause can in certain cases protect against the introduction of unduly prejudicial evidence at a

27

criminal trial"—was "a holding of this Court for purposes of AEDPA." *Id.*

The Warden argues that *Andrew* cannot constitute clearly established law for purposes of AEDPA because it postdates Mr. Shepard's conviction. However, *Andrew* did not purport to break new ground. To the contrary, *Andrew* held that, at the time of the petitioner's conviction in 2004, "it was clear that the introduction of unduly prejudicial evidence could, in certain cases, violate the Due Process Clause." *Id*. at 93; *see also Douglas v. Bauman*, No. 19-cv-10261, 2025 WL 1416984, at *11 (E.D. Mich. May 15, 2025) (stating that *Andrew* "reiterated that it is clearly established" that introduction of evidence can violate the Due Process Clause if the evidence is so prejudicial as to render the trial fundamentally unfair).

The Warden also cites *Stewart v. Winn*, 967 F.3d 534 (6th Cir. 2020), for the proposition that, under AEDPA, a petitioner "must identify a Supreme Court case that addresses the 'specific kind of evidence' challenged." *Id*. at 538 (quoting *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012)). That holding appears to be inconsistent with *Andrew*'s statement that *Payne* was not limited to its facts because "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court." 604 U.S. at 94. The Court also stated that, although it "ha[d] not previously relied on *Payne* to invalidate a conviction for improperly admitted prejudicial evidence . . . 'certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.'" *Id*. at 95 (quoting *White v. Woodall*, 572 U.S. at 427).

Another court in this district has held that *Stewart* and other similar cases from the Sixth Circuit do not carry the day in light of *Andrew*. *See Ali v. Moore*, No. 5:23-CV-02332, 2026 WL 999883 (N.D. Ohio Apr. 14, 2026) (report and recommendation). Like Mr. Shepard,

28

the petitioner in *Ali* argued that the trial court violated his due process rights by admitting prejudicial other acts evidence. *Id*. at \*5. The Warden argued that the petitioner's claim was not cognizable under *Stewart* and other Sixth Circuit cases because the petitioner needed to identify a Supreme Court case dealing with the specific kind of evidence at issue. *Id*. at \*6.

The *Ali* court held that *Andrew* "precludes a finding that no clearly established Supreme Court precedent is applicable here." *Id*. The court noted that *Andrew* rejected the Tenth Circuit's position that there was no Supreme Court precedent establishing a general rule that the erroneous admission of prejudicial evidence can violate due process. *Id*. (quoting *Andrew*, 604 U.S. at 87-88). *Ali* further held that *Stewart* "rejected any possible finding that AEDPA limited the holding in *Payne* to its facts . . . ." *Id*. Accordingly, the *Ali* court concluded that there was "clearly established U.S. Supreme Court precedent sufficient to require consideration of the merits" of the petitioner's claim that the admission of prejudicial other acts evidence violated his due process rights. *Id*. at \*7.

*Ali* is persuasive, and I agree that *Andrew* and *Payne* constitute clearly established law for purposes of Mr. Shepard's claim, notwithstanding *Stewart* and other similar decisions from the Sixth Circuit. The question, then, is whether the Eighth Appellate District acted contrary to or unreasonably applied *Andrew* and *Payne* when it held that the testimony from Detective Bauhof regarding Mr. Bilal and Mr. Greenhouse was admissible.

Mr. Shepard argues that the trial court should not have permitted Detective Bauhof to testify that Mr. Bilal and Mr. Greathouse were suspected in or had been charged with other crimes, including drug trafficking, arson, and murder, because that testimony was irrelevant, unduly prejudicial, and served only to allow the State to present its speculative theory of the case under the guise of providing investigative background.

As an initial matter, Mr. Shepard is incorrect when he argues that evidence of crimes Mr. Greathouse and Mr. Bilal allegedly committed was irrelevant to the State's case against him. Mr. Shepard argues, for example, that the trial court should not have permitted Detective Bauhof to testify that Mr. Greathouse had been indicted for arson in connection with a murder that occurred in 2019. However, Detective Bauhof testified that Mr. Greathouse was indicted for arson of a car listed to the victim a few days before the victim was murdered. (ECF No. 8-5, 716:8-24). Detective Bauhof further testified that Mr. Greathouse was in Texas at the time of the murder and that cell phone records for Mr. Shepard included calls to a Texas area code. *Id*. at 716:25-717:15.

That testimony may have been speculative, but it was not *irrelevant*. As Mr. Shepard's counsel told the trial court during a sidebar immediately preceding that testimony, the State's theory of the case was that the victim loaned his car for use in a murder, that the car was set on fire, and that the victim was killed because he was a witness and was cooperating with the police. *Id*. at 711:6-20. Unlike *Andrew*, where the trial court permitted irrelevant testimony regarding the defendant's sex life and clothing choices, Detective Bauhof's testimony went directly to the question of why the victim may have been murdered and who may have carried it out.

The same is true of Detective Bauhof's testimony regarding Mr. Bilal's alleged drug activities. Detective Bauhof testified that he received a social media photograph of the individual allegedly known as "Cam" from a tipster, and that the photograph was provided to the gang impact unit. (ECF No. 8-5, 694:2-8). Detective Bauhof also testified that the gang impact unit provided him with information identifying "Cam" as Mr. Bilal, and that vice detectives had an open drug investigation into him. *Id*. at 694:8-695:1. Detective Bauhof

testified that vice agents were contacting Mr. Bilal to buy narcotics by contacting a telephone number that showed up in Mr. Shepard's call logs. *Id*. at 695:2-20. Mr. Bilal's alleged drug trafficking was relevant to the detectives' investigation and to explaining how detectives linked Mr. Shepard to the telephone number.

Nor was the State given free rein to present its theory of the case through such testimony. During the trial, Mr. Shepard's counsel objected when the prosecution asked Detective Bauhof to explain his theory with respect the motive for the murder. (ECF No. 8-5, PageID # 965). During the ensuing sidebar, Mr. Shepard's counsel objected that the prosecution was seeking to elicit a "truly speculative" theory that the victim had loaned his car in connection with a murder, that the car had then been set on fire, and that the victim was killed because he was a witness and was cooperating with the police. *Id*. at PageID # 966. The court ruled that Detective Bauhof could testify regarding "what else came up in the investigation itself" but that he should do so "without identifying this as a theory or a motive" and that the jury "if they make a connection, that's their purview to do without a detective impugning any additional weight to that . . . ." *Id*. at PageID # 968. Following the sidebar, Detective Bauhof testified that Mr. Greathouse was indicted for arson of the victim's vehicle on the same date as the victim's murder, but did not express any theories regarding motive for the murder. *Id*. at PageID # 971. Detective Bauhof's testimony regarding Mr. Bilal's criminal history was likewise brief and did not include any theory of how Mr. Bilal's alleged drug trafficking activities may have played a role in the murder. (ECF No. 8-5, 694:13-695:10).

Given the limited scope of the testimony that the trial court permitted Detective Bauhof to offer, I cannot say that admission of this testimony rendered the trial fundamentally

unfair. Nor can I say that the Eighth Appellate District acted contrary to or unreasonably applied clearly established law in holding that the testimony was properly admitted to establish the detectives' "investigation of the events and individuals involved in the shooting of the victim." (ECF No. 8-1, Exhibit 8, ¶ 86). I therefore alternatively recommend that the Court deny Mr. Shepard's second ground for relief on the merits.

Although I conclude that Mr. Shepard's second ground for relief fails under AEDPA, however, I am troubled by what occurred during the trial. Despite the trial court's efforts to limit Detective Bauhof's testimony, jurors heard testimony that Mr. Shepard was affiliated with alleged drug traffickers, arsonists, and murderers, one of whom had allegedly set the victim's car on fire. There is also potential merit to Mr. Shepard's argument that, because the prosecution asked Detective Bauhof to explain his theory of the case immediately before he testified about Mr. Greathouse's arson charge, the State primed the jury to infer motive, even if the trial court made the state withdraw the question.

Mr. Shepard is wrong that Detective Bauhof's testimony was irrelevant. But whether the testimony was unduly prejudicial is potentially another matter. That is particularly true given the weak, circumstantial evidence tying Mr. Greathouse and Mr. Bilal to the murder, which included a Texas phone number that may have belonged to Mr. Greathouse and a Chrysler that may have belonged to Mr. Bilal, even though the car appeared to be the wrong color in surveillance videos. Accordingly, while I recommend that the Court deny Mr. Shepard's second ground for relief, I also recommend that the Court grant him a certificate of appealability.

### 3. *Ground Three: Sufficiency of the Evidence*

In his third and final ground for relief, Mr. Shepard argues that his due process rights were violated because the evidence presented at trial was insufficient to convict him of

32

complicity as a matter of law. While Mr. Shepard's arguments are not without some force, they are ultimately unavailing given the substantial deference I must give to the state courts' rulings under AEDPA.

"Criminal defendants have a due-process right not to be convicted of a crime 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [they are] charged.'" *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018) (quoting *In re Winship*, 397 U.S. 358, 364 (6th Cir. 2018). Challenges to a state court conviction based on the sufficiency of the evidence are properly cognizable in a federal habeas corpus petition. *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979). In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. The reviewing court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Review of sufficiency of the evidence challenges involves "a double layer of deference[.]" *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). "First, [a court] must view the evidence in the light most favorable to the prosecution, and determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Mathis v. Colson*, 528 F. App'x 470, 476 (6th Cir. 2013) (quoting *Jackson*, 443 U.S. at 319). "Second, 'even were [a court] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [a court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.'" *Id.* (quoting *Brown,* 567 F.3d at 205). A habeas petitioner "who challenges

33

the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. The parties agree that, because Mr. Shepard's other convictions merged into his conviction for complicity to commit murder, it is the complicity charge against which the sufficiency of the evidence must be measured.

Ohio's complicity statute, O.R.C. § 2923.03(A), provides in relevant part that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . . [a]id or abet another in committing the offense" or "[c]onspire with another to commit the offense . . . ." O.R.C. § 2923.03(A)(2)-(3). The aider or abettor must also share the same criminal intent as the principal. *State v. Johnson*, 93 Ohio St. 3d 240, 754 N.E.2d 796, 797 (2001). Criminal intent may be inferred from the circumstances surrounding the crime. *Id*. Notably, the Ohio Supreme Court "has held that the state need not establish the identity of the principal in order to convict an offender of complicity." *In re T.K.*, 109 Ohio St. 3d 512, 849 N.E.2d 286, 288 (2006).

Mr. Shepard argues that the evidence was insufficient to support his conviction for complicity because there was no direct evidence that he committed any criminal act, and because the State convicted him based on speculation and inappropriate testimony regarding relationships he may have had with other individuals who may have been involved in the crime. Mr. Shepard notes that none of the witnesses placed him at the scene at the time of the murder, and he further notes that detectives admitted they lacked direct evidence of his

involvement.

After extensively summarizing the evidence presented against Mr. Shepard, the Eighth Appellate District rejected his sufficiency of the evidence claim as follows:

{¶ 61} The state argued that Shepard aided and abetted the offenses. Shepard contends that the evidence is insufficient to establish the requisite elements of the convictions based on complicity. R.C. 2923.03(A) provides in pertinent part that [n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense." R.C. 2923.03 (A)(2). "[C]onviction of the principal offender is not a prerequisite to finding a defendant guilty of complicity." *State v. Gardner*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, ¶ 34, citing R.C. 2923.03(B) ("It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender."). The state is not required to establish the principal's identity to convict an offender of complicity, but only that the state proves that a principal committed the offense. *Id*., citing R.C. 2923.03(C) and *State v. Perryman*, 49 Ohio St.2d 14, 358 N.E.2d 1040 (1976), paragraph four of the syllabus, vacated on other grounds, sub nom., *Strodes v. Ohio*, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

{¶ 62} Counts 2, 3, and 4 merged into Count 1, and Shepard was sentenced on one three-year gun specification and Count 1, aggravated murder, only, "so we consider the sufficiency of the evidence on [that conviction] only." (Footnote omitted). *McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, at ¶ 25, citing *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 24 ("A 'conviction' consists of a guilty verdict and the imposition of a sentence or penalty [emphasis sic]."). *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 138 (merger of kidnapping count with aggravated-robbery and aggravated-burglary counts moots sufficiency-of-the-evidence claim regarding kidnapping count).

{¶ 63} R.C. 2923.03, entitled "Complicity," does not define aiding and abetting. The Ohio Supreme Court has stated that to aid or abet means to " '[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.' " *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001), quoting Black's Law Dictionary 69 (7th Ed.1999).

"To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." Johnson at syllabus. " 'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Id*. at 245, 754 N.E.2d 796, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). "The court must view the evidence in the light most favorable to the prosecution and defer to the trier of fact on questions of credibility and the weight assigned to the evidence. *State v.*

35

*Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 146." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132.

*McFarland* at ¶ 29.

{¶ 64} R.C. 2903.01(A), aggravated murder, provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." "The element of prior calculation and design 'require[s] a scheme designed to implement the calculated decision to kill.' " *Id.* at ¶ 31, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 65} There is substantial support in the record that the Chrysler was in the immediate vicinity of the Burten Center during the shooting. The shooter followed the route taken by the victim into the area that the victim had just exited and shot Doe whom CPD believe was mistaken for the victim. Witness Terrell testified that the victim called someone on his cell phone and asked where the bike had been left as he exited her car. The cell phone evidence confirmed that the call was made to the 9510 cell phone number. The cell phone evidence also established that the owner of the Chrysler and the 9510 number made calls to each other the day of the shooting. Shepard's DNA was found on the handles of the bike.

{¶ 66} The CMHA motion-activated video excerpts showed the dirt-bike rider entering eastbound into the area followed by a dark SUV that waited for the rider. The Chrysler appeared from the opposite direction and stopped by the black SUV. The drivers' sides of the vehicles were aligned for a few moments, then the Chrysler pulled off.

{¶ 67} The rider approached from behind the trees heading east toward the black SUV as the Chrysler entered the picture heading west and slowly backed up with the rider walking alongside the Chrysler's passenger side. They stopped and interacted briefly, and the rider gestured to the area where the bike was left. The rider entered the black SUV and departed. The Chrysler drove out of view, returned heading eastbound, parked in front of the place that the bike had been left, and turned off its lights.

{¶ 68} Witness Terrell's vehicle entered heading eastbound and stopped in the middle of the street to the left of the parked Chrysler facing west. The victim exited as he asked the individual on the cell phone where the bike was located. The motion-activated camera showed the victim quickly cross the street in front of Terrell's car and behind the parked Chrysler to get the bike. The shooter immediately followed and began firing. The shooting stopped, and the Chrysler pulled away.

{¶ 69} Shepard argues that the state's case was based on mere speculation and circumstantial evidence and that mere presence at the scene is not enough to establish

36

complicity. "Participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed." *Gardner*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, at ¶ 35, quoting *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). Additionally, "[a]iding and abetting may be shown by both direct and circumstantial evidence." *Id*., citing *State v. High*, 2018-Ohio-2236, 115 N.E.3d 702, ¶ 23 (8th Dist.).

{¶ 70} The trial court properly instructed the jury on the definitions of circumstantial and direct evidence. The jury was also informed:

> It is your job to decide how much weight to give to the direct and the circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all of the evidence, both direct and circumstantial, and give it whatever weight that you believe it deserves.

Tr. 814.

{¶ 71} We add that this court has held:

> "To be convicted as an aider and abettor such person must: (1) engage in an overt act 'with a view' towards producing the result for which he [or she] is held; and (2) such person must himself [or herself] possess the felonious intent that the principal possesses." *State v. Boigner*, 8th Dist. Cuyahoga No. 34514, 1976 WL 190781, 3, 1976 Ohio App. LEXIS 7630, 3 (Mar. 25, 1976), citing *Woolweaver v. State*, 50 Ohio St. 277, 288, 34 N.E. 352 (1893). "It is not necessary that the accused be in a position to foresee the precise consequence of his [or her] conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his [or her] conduct." *State v. Losey*, 23 Ohio App.3d 93, 95-96, 23, 491 N.E.2d 379 (10th Dist.1985).

*Gardner* at ¶ 33.

{¶ 72} Viewing the evidence in a light most favorable to the prosecution and giving due deference to the trier of fact on questions of credibility and adequacy, this court does not find that the evidence in this case was insufficient as a matter of law to support the elements of complicity to aggravated murder. This court also does not find that this is the exceptional case where the jury clearly lost its way. The weight of the evidence supports the conviction.

(ECF No. 8-1, Exhibit 8).

As I noted above, I am troubled by the strength of the evidence against Mr. Shepard

and the extent to which the State was able to present its case through speculative testimony

from detectives and other witnesses. While the State showed that Mr. Shepard rode the victim's bike to the scene of the murder, virtually everything else about the State's theory is a matter of at least some dispute, including whether Mr. Shepard spoke to anyone on the phone that night; what, if anything, he said to the unknown individuals in the Chrysler; the identity of the owner of the Chrysler and whether the car belonged to Mr. Bilal; whether Mr. Bilal and Mr. Greathouse were involved in the murder; what relationship Mr. Shepard had with Mr. Bilal and Mr. Greathouse; and whether Mr. Shepard knew that the unknown principals intended to murder the victim. Given those gaps in the evidentiary record, I believe a reasonable juror could conclude that the evidence was insufficient as a matter of law to convict Mr. Shepard of complicity.

Applying the double layer of deference under AEDPA, however, I cannot say either that the evidence was insufficient for a rational trier of fact to find Mr. Shepard guilty or that the Eighth Appellate District's sufficiency determination was unreasonable. As an initial matter, while Mr. Shepard correctly notes that there was no direct evidence linking him to the murder, "[a] conviction may be sustained based upon nothing more than circumstantial evidence." *Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008). In addition, "it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume —even if it does not affirmatively appear in the record—that the trier of the fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* at 7 (quoting *Jackson*, 443 U.S. at 326).

As the Eighth Appellate District found, the circumstantial evidence in this case

38

included: (1) fingerprint evidence tying Mr. Shepard to the victim's dirt bike, which the State alleged was used to lure the victim to the scene of the murder; (2) video evidence showing an individual likely to be Mr. Shepard riding the bike to the scene of the murder; (3) testimony that the victim asked an unknown individual on the telephone where his bike was shortly before he was murdered; (4) telephone records showing that Mr. Shepard called phone numbers from prison that were connected to a cell phone that also communicated with the victim; (5) the detectives' testimony regarding Mr. Bilal and Mr. Greathouse, Mr. Bilal's potential (though disputed) ownership of the Chrysler, and Mr. Shepard's alleged involvement with both individuals; and (6) surveillance video evidence showing that an Mr. Shepard appeared to speak to individuals in the Chrysler and to point out the location of the bike.

That evidence was far from ironclad. Under *Jackson*, however, the question is whether *any* rational trier of fact could have found Mr. Shepard guilty of complicity based on it. I conclude that the evidence here clears that low bar. *See Stewart v. Wolfenberger*, 595 F.3d 647, 655-58 (6th Cir. 2010) (rejecting sufficiency of the evidence challenge to aiding and abetting conviction even though petitioner was not present at time of crime and there was no evidence that petitioner knew principals intended to rob specific individual or that murder would be committed). Even if I did not, the Eighth Appellate District's contrary holding was not unreasonable.

Mr. Shepard also argues that his conviction resulted from "emotionally charged speculation and testimony that should have been limited, [but] regrettably was not . . . ." (ECF No. 11, PageID # 1149). However, "'a reviewing court must consider all of the evidence admitted by the trial court,' regardless of whether that evidence was admitted erroneously."

39

*McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (quoting *Lockhart v. Nelson*, 48 U.S. 33, 41 (1988)); *see also Sanborn v. Parker*, 629 F.3d 554, 578 (6th Cir. 2010). "This is because '[i]t is impossible to know what additional evidence the government might have produced had the faulty evidence been excluded at trial, or what theory the government might have pursued had the evidence before the jury been different . . . .'" *Hendrix v. Palmer*, 893 F.3d 906, 928 (6th Cir. 2018) (quoting *United States v. Quinn*, 901 F.2d 522, 530 (6th Cir, 1990)). Moreover, "'[i]t would prolong trials unduly to adopt a rule that would require the government to introduce all available evidence and assert every possible legal theory in anticipation of reversal of trial court rulings admitting evidence.'" *Id*. (quoting *Quinn*, 901 F.2d at 531).

The question, then, is not whether detectives and other witnesses were impermissibly allowed to speculate regarding Mr. Shepard's relationship with Mr. Bilal and Mr. Greathouse or their involvement in the crime. The question is whether, given that testimony and the other evidence presented at trial, a rational trier of fact could have found Mr. Shepard guilty of complicity as a matter of law. While the evidence against Mr. Shepard was not overwhelming, the Eighth Appellate District did not err in answering that question in the affirmative.

I acknowledge, however, that this case is closer than many habeas sufficiency of the evidence challenges. As Ohio Supreme Court Justice Donnelly noted in dissent, there is a potential "concern[] that speculation in this case has been mistaken for circumstantial evidence and that [Mr.] Shepard has received a life sentence based solely on that speculation." (ECF No. 8-1, Exhibit 12, ¶ 9). Accordingly, I also recommend that the Court grant Mr. Shepard a certificate of appealability with respect to his third ground for relief.

## VI. RECOMMENDATION REGARDING CERTIFICATE OF APPEALABILITY

### A. Legal Standard

As amended by AEDPA, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not

40

appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "[a] 'substantial showing' requires the applicant to 'demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)). The statute requires that certificates of appealability specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. "If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." *Id*.; see also 28 U.S.C. § 2253(c)(3) ("The certificate of appealability under [§ 2253(c)(1)] shall indicate which specific issue or issues satisfy the showing required by [§ 2253(c)(2)]."). In light of the Rule 11 requirement that the court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

41

**B.  Analysis**

While I conclude that Mr. Shepard procedurally defaulted on his first two grounds for relief and that all three grounds fail on the merits, jurists of reason could debate those conclusions given Mr. Shepard's references to federal constitutional law in his appellate brief before the Eighth Appellate District and the fact that much of the evidence against him came through  testimony from detectives and other witnesses that was arguably both speculative and hearsay. Accordingly, I recommend that the Court grant Mr. Shepard a certificate of appealability with respect to each of his grounds for relief.

**VII.  RECOMMENDATION**

For the foregoing reasons, I recommend that the Court dismiss and/or deny Mr. Shepard's petition for a writ of habeas corpus under 28 U.S.C. § 2254. I also recommend that the Court grant him a certificate of appealability with respect to each of his grounds for relief.

 Dated:  April 23, 2026                              /s/*Jennifer Dowdell Armstrong*
                                                     Jennifer Dowdell Armstrong
                                                     U.S. Magistrate Judge


**NOTICE TO PARTIES REGARDING OBJECTIONS**

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings

42

or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

43