**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SHEPARD, | ) | Case No. 1:25-CV-00955 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jennifer D. Armstrong |
| DOUGLAS FENDER, Warden, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**OPINION AND ORDER**

Petitioner Robert Shepard, a prisoner in State custody, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. A jury found Mr. Shepard guilty of aggravated murder, murder, and felonious assault. The State trial court imposed a sentence of 33 years to life in prison. Mr. Shepard raises three grounds for relief. Petitioner contends that: (1) the State trial court violated his rights under the Confrontation Clause of the Sixth Amendment; (2) the State trial court admitted evidence of unrelated criminal acts allegedly committed by other unindicted individuals in violation of his due process rights; and (3) his conviction was based on legally insufficient evidence.

Though troubled by the weak and circumstantial case against Petitioner, the Magistrate Judge recommends denying Petitioner's claims but recommends the issuance of a certificate of appealability on all three grounds. Petitioner objects to the recommendation that Petitioner's claims be denied. Respondent objects to the

Magistrate Judge's recommendation for a certificate of appealability. For the following reasons the Court **OVERRULES** Petitioner's objections, **ADOPTS** the Magistrate Judge's Report and Recommendation, and **DENIES** the petition for a writ of habeas corpus. Further, the Court **DECLINES** to issue a certificate of appealability on Petitioner's first two grounds for relief and **GRANTS** a certificate of appealability on Petitioner's third ground for relief.

## FACTUAL AND PROCEDURAL BACKGROUND

This petition for writ of habeas corpus arises from a conviction in State court. Unless the habeas petitioner demonstrates otherwise with clear and convincing evidence, federal courts presume the State court's findings of fact are correct. *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a State court of appeals based on the trial court record. *Mitzel*, 267 F.3d at 530. The intermediate State appellate court based its decision on the following facts.

### A. The Murder of Frank Q. Jackson

On September 19, 2021, Frank Q. Jackson, the grandson of Cleveland's mayor at the time, was shot and killed on Anita Kennedy Road, a road located in the Cleveland Metropolitan Housing Authority ("CMHA") Garden Valley area. (ECF No. 8-1, ¶ 2, PageID #192.) Less than two hours before Jackson was shot, a minor victim was shot multiple times at Cleveland's Lonnie Burten Recreation Center and Park, an area from which Jackson recently departed. (*Id.*) Cleveland police suspected that the shooter intended to kill Jackson but shot the minor victim in a case of mistaken identity. (*Id.*, ¶ 2, PageID #192.) At the time of the shooting,

Jackson and the minor victim were wearing similar clothes. (*Id.*, ¶ 22, PageID #198; *Id.*, ¶ 37, PageID #202.)

Before the shooting at the Burten Recreation Center, Jackson was tailgating with his sister and her friends. (*Id.*, ¶ 22, PageID #198.) He arrived at Cleveland Browns stadium around 1:00 p.m. and tailgated until 4:00 p.m., at which time his brother-in-law drove him home. (*Id.*) Jackson proceeded to change into a black shirt and red jogging pants and left for the Burten Recreation Center on his dirt bike. (*Id.*)

A video from a gas station at East 55th Street and Woodland Avenue showed an individual riding the dirt bike at 7:08 p.m. (*Id.*, ¶ 23, PageID #198.) According to the victim's sister, the individual riding the dirt bike was *not* Jackson. (*Id.*) From approximately 7:34 p.m. to 7:46 p.m., a black male in a white shirt was seen riding the victim's dirt bike in the area of East 49th Street and Outhwaite Avenue. (ECF No. 8-1, PageID #201.)

At 7:51 p.m., Jackson was recorded walking near the entrance of the Burten Recreation Center talking on his cell phone. (*Id.*, ¶ 36, PageID #201–02.) The next recording showed Jackson walking into the playground area of the Burten Center at 7:53 p.m. (*Id.*, ¶ 37, PageID #202.) Also at 7:53 p.m., the suspected shooter of the minor victim was captured by a camera in front of the Burten Recreation Center walking down the same street as Jackson, as though he were following him. (*Id.*) The recording showed the minor victim entering the playground on a parallel walkway that was divided by tall, thick shrubs, at the same time Jackson was leaving. (*Id.*) Dressed nearly identically to Jackson, the minor victim was wearing

red pants and a white and red or black striped shirt. (*Id.*) At 7:54 p.m., the minor victim was walking out of the playground toward the street when the shooter walked up to him and fired until the minor victim fell. (*Id.*) Then, the shooter fled, and people ran through the park, including Jackson, where they gathered at the football field sign. (*Id.*)

Jackson and several others began assisting another individual who was wounded in the gunfire. (*Id.*, ¶ 38, PageID #202.) A friend of Jackson, DaNesha Terrell, ran to the Burten Recreation Center to check on family and friends after being notified that shots were fired. (*Id.*, ¶ 16, PageID #196.) When she arrived at the Burten Recreation Center, she ran into Jackson who she "practically grew up" with. (*Id.*, ¶ 17, PageID #196.) Jackson, who lived about eight blocks from the Burten Recreation Center, asked Terrell if she would give him a ride to pick up his dirt bike. (*Id.*)

Terrell and her brother drove Jackson to a side street that intersected Anita Kennedy Avenue. (*Id.*) The only time that Jackson used his cellphone during the ride was when he exited the car. (*Id.*) Terrell overheard Jackson ask someone on the phone "where['s] the bike at" as he exited the car. (*Id.*) Jackson stepped out of the car and asked Terrell to wait for him until he retrieved his bike. (*Id.*, ¶ 18, PageID #196.) She briefly looked down at her phone, saw her mother was calling, heard shots, and looked up to see Jackson lying on the ground. (*Id.*, ¶ 18, PageID #196–97.)

Terrell quickly pulled away from the area and called 911 as well as Jackson's sister. (*Id.*, ¶ 18, PageID #197.) On the call, Terrell asked for assistance and advised

that the shooter was in a gray Chrysler 300 with dark-tinted windows, and the shooter was wearing Timberland boots, light blue jeans, a white pullover hoodie, and a yellow face mask. (*Id.*) The shooting took place in a walkway between the townhouse style buildings with decorative fencing to the left and right of the walkway. (*Id.*, ¶ 28, PageID #28.) Jackson's dirt bike was found behind the fence to the right. (*Id.*)

### B. The Investigation

Cleveland police detectives responded to the scene and began investigating. (*Id.*) At the scene, DNA swabs were taken of multiple shell casings, the dirt bike, and a cell phone collected at the scene. (*Id.*, ¶ 28, PageID #199–200.) Initially, detectives believed that Mr. Jackson was the sole operator of the bike throughout the incident but later obtained information that he was not. (*Id.*)

Police began interviewing residents and bystanders, but many refused to cooperate. (*Id.*, ¶ 30, PageID #200.) However, police were able to interview resident Kimberlie Davis on two occasions. (*Id.*) Based on these interviews, Mr. Shepard became a person of interest. (*Id.*) Davis advised the police that Mr. Shepard was at the house earlier in the day when it was light outside and that she gave him something to eat. (*Id.*, ¶ 31, PageID #200.) Davis stated that she did not see Mr. Shepard with the dirt bike but later said that she only saw Mr. Shepard with the dirt bike during the day. (*Id.*) Also, police recovered a gas can from Davis's residence, which they determined might be relevant to the investigation. (*Id.*, ¶¶ 29–32, PageID #200–01.)

A laboratory technician analyzed the DNA recovered at the crime scene. (*Id.*, ¶ 45, PageID #204–05.) DNA found on the handlebars of the dirt bike was a mixture of DNA from the victim and four other individuals. (*Id.*) The analyst determined that there was a DNA match with Mr. Shepard from DNA collected on the left and right handlebar of the dirt bike. (*Id.*) However, there was an insufficient amount of DNA from the gas can and bullet casing. (*Id.*)

The bullet casings, a fired bullet, and several bullet fragments recovered were determined to come from a Glock. (*Id.*, ¶ 46, PageID #205.) Examination of a ballistic database revealed that there was a potential match for one of the bullet casings that indicated the weapon might have been used in several other shootings but none on the same day. (*Id.*)

Police began to compile video evidence related to the shootings and created a video compilation. (*Id.*, ¶ 33, PageID #201.) Several clips at the beginning of the video compilation depicted a black male in a white shirt riding Jackson's dirt bike in the general area of the Burten Recreation Center at approximately 7:34 p.m. to 7:46 p.m. (*Id.*) A clip from a camera at the Burten Recreation Center showed Jackson walking down the street at 7:51 p.m. looking at or talking on his cellphone. (*Id.*, ¶ 36, PageID #201–02.) The next several clips showed the shooting of the minor victim. (*Id.*, ¶¶ 36–38, PageID #202.) Another clip began at 7:56 p.m., three minutes after the shooting of the minor victim, and showed a gray Chrysler driving through the immediate area and the parking lot of the Burten Recreation Center as others fled. (*Id.*, ¶ 38, PageID #202.)

The video compilation shifted to an 8:50 p.m. clip and showed the rider of the dirt bike heading toward the area where Jackson was later shot. (*Id.*, ¶ 40, PageID #203.) The following clips focused on the dirt bike rider, the victim, a black SUV, and the Chrysler. (*Id.*) One video clip showed the rider of the dirt bike travelling eastbound and the silver Chrysler travelling westbound on Anita Kennedy Road. (*Id.*, ¶ 41, PageID #203.) Further, it showed the Chrysler stopping next to a black SUV where it looked like the occupants of each vehicle were talking. (*Id.*) Next, the clip showed the Chrysler reversing down the street, and it appeared that the rider of the dirt bike was no longer on the bike but walking next to the Chrysler. (*Id.*)

The clip indicated that the rider of the dirt bike might have interacted with occupants of the Chrysler before it pulled out of view of the camera. (*Id.*, ¶ 42, PageID #203.) Then, the rider appeared to be speaking with the occupants of the black SUV, at which point the black vehicle opened the back door and disappeared from the view of the camera. (*Id.*) Returning into view of the camera, the silver Chrysler proceeded to return down Anita Kennedy Road and back into a parking spot on the side of the road. (*Id.*, ¶ 43, PageID #203–204.) Then, Terrell's car entered the scene. (*Id.*) Jackson approached the area where his dirt bike was located, followed by someone approaching him, extending his arm, and shooting him. (*Id.*)

Near the time of the first shooting, no video clips were found depicting the person riding the dirt bike near the Burten Recreation Center. (*Id.*, ¶ 44, PageID #204.) Later, video clips showed the dirt bike and the black SUV arriving near the area of Jackson's shooting at about the same time and coming from the same

direction. (*Id.*) The Chrysler appeared from the opposite direction. (*Id.*) There was a brief interaction between what appeared to be the rider of the dirt bike and the Chrysler, and the rider of the dirt bike eventually entered the black SUV and left the area. (*Id.*)

The Cleveland police received tips about the Chrysler and determined that it had a distinctive oversized sunroof. (*Id.*, ¶ 56, PageID #208.) This tip led investigators to an individual named Cam who had a Chrysler 300 that he had disposed of after the shooting. (*Id.*) Through social media, the police secured a picture that identified Rashad Bilal as an owner of a light blue Chrysler 300 that generally fit the description. (*Id.*) Bilal was the target of a narcotics investigation. (*Id.*) Cleveland police attempted to locate the light blue Chrysler but were unable to find it. (*Id.*) Police were unable to identify Bilal as the driver of the Chrysler used in the shooting, though he was still a suspect at the time of trial. (*Id.*, ¶ 59, PageID #209.) Also, the police were unable to prove that the car used in the shooting was titled to Bilal. (*Id.*)

During the investigation, Detective Shane Bauhof began canvassing with the police's gang-impact unit and CMHA. (*Id.*, ¶ 52, PageID #206-07.) Detective Bauhof "learned of a subject that delivered [the victim's] dirt bike to the area and . . . why [the victim] was instructed to go to Garden Valley [by East 70th Street and Kinsman Avenue] to pick up his dirt bike," even though the victim did not live there. (*Id.*) Based on this information, the police suspect that Mr. Shepard was the rider of the dirt bike. (*Id.*)

Two cellphones were recovered from the victim, and a forensic software download was performed. (*Id.*, ¶ 47, PageID #205.) One phone appeared to have no relevance to the shooting. (*Id.*) The other phone, with a number ending in 1523, appeared to be Jackson's primary phone and was the primary focus of the investigation. (*Id.*) Jackson's primary phone showed seven outgoing calls made to a number ending in 9510 between 8:49 p.m. and 9:03 p.m. (the shooting occurred around 9:10 p.m.). (*Id.*, ¶ 48, PageID #205.) Two of the early calls lasted a minute and 12 seconds. (*Id.*, ¶ 48, PageID #205–06.) The other calls, including the last call, might not have connected. (*Id.*, ¶ 48, PageID #206.) Additionally, the 9510 number called Jackson's phone two days before the shooting. (*Id.*) There were no incoming calls from the 9510 number on the day of the shooting. (*Id.*, ¶ 51, PageID #206.)

Police attempted to identify the owner of the 9510 number but were unable to do so. (*Id.*, ¶ 49, PageID #206.) Phone records were secured for the 9510 number, and police reviewed the call patterns during the relevant time frame. (*Id.*)

A search was performed on Mr. Shepard's jail-phone records to see if he made calls to numbers found in the 9510 records. (*Id.*, ¶ 50, PageID #206.) This search found that Mr. Shepard made calls to several numbers found in the records of the 9510 phone. (*Id.*) There was no evidence of who possessed the numbers at the time Mr. Shepard called them. (*Id.*, ¶ 51, PageID #206.) Also, there was no direct evidence that Mr. Shepard owned the 9510 number. (*Id.*)

Cell phone records showed calls to and from Bilal and the 9510 number attributed to Mr. Shepard on multiple days prior to the shooting. (*Id.*, ¶ 57, PageID

#208.) On the day of the shooting, Bilal called the 9510 number shortly before the first shooting, again about an hour before Jackson was shot, and finally in the early hours of the morning the next day. (*Id.*) Records showed that the 9510 number called Bilal multiple times throughout the day of the shootings. (*Id.*)

Police believed that the day of the shooting was significant because that was the day that an individual named James Greathouse was either indicted or a warrant was issued for his arrest in relation to an arson connected with a homicide. (*Id.*, ¶ 58, PageID #209.) The arson was for a vehicle that was "listed back" to Jackson. (*Id.*) Greathouse was in Texas at the time of the shootings. (*Id.*) Cell phone records from the 9510 number and from Bilal contained calls to a number with a Texas area code. (*Id.*) Police also determined that Mr. Shepard, Bilal, and Greathouse were associates but were unable to identify the owner of the Texas phone. (*Id.*) Based on the evidence gathered, Mr. Shepard was eventually charged with aggravated murder, murder, and two counts of felonious assault. (*Id.*, PageID #151.)

### C. Trial

The State's theory of the case was that Mr. Shepard aided and abetted the murder of Jackson by planting his dirt bike in a CMHA housing area, knowing that Jackson would go to retrieve it and be shot. (*Id.*, PageID #192)

The evidence secured throughout the investigation was presented at trial. (*Id.*, PageID #196–219.) The State questioned Detective Bauhof and asked if he had a theory about why Jackson was murdered and who would want to kill him. (ECF No. 8-5, PageID #965.) Defense counsel objected to the question, arguing that the response called for speculation on the connections between people and events. (*Id.*,

PageID #965–67.) The State trial court overruled the objection and allowed the detective to testify to the investigation but would not allow the State to link it to a theory or create a motive. (*Id.*, PageID #968–69.) The prosecution was asked to withdraw its question and instead ask what additional investigative steps were taken and if there was relevance to the date the murder happened. (*Id.*, PageID #970.) The prosecutor proceeded to ask the detective about the relevance of the date of September 16, 2021 to the murder of Mr. Jackson. (*Id.*, PageID #971.) In response, the detective answered that September 16, 2021 was the date on which Greathouse was indicted for arson or a warrant was issued for arson in connection with a homicide that occurred in 2019. (*Id.*) Also, the detective testified that the arson was of a vehicle "listed back" to Jackson. (*Id.*, PageID #972.)

The State continued questioning the detective and asked whether there was a connection between Mr. Shepard and Greathouse. (*Id.*) The detective answered that the two men were associates and that Mr. Shepard called a Texas area code number while incarcerated, a location where Greathouse was known to be. (*Id.*) Further, the State asked how Mr. Shepard was identified as a suspect, to which the detective replied that he became a suspect in the murder that night because of information from the gang impact unit. (*Id.*, PageID #972–73.)

On cross examination, the detective admitted that he had no evidence that Mr. Shepard knew that Jackson was going to be shot that night, no information that Mr. Shepard intended to have Jackson killed, and no information to suggest that Mr. Shepard knew that Jackson was killed that night. (*Id.*, PageID #1004–05.)

After the State's case in chief, the defense moved for a judgment of acquittal, arguing that there was insufficient evidence to connect Mr. Shepard to the murder. (*Id.*, PageID #1019–20.) The State trial court overruled the motion. (*Id.*, PageID #1022.) The defense rested and renewed the motion for a judgment of acquittal, and the motion was again denied. (*Id.*, PageID #1029–30.) Mr. Shepard was convicted on all four counts. (*Id.*, PageID #1112.) The four counts merged into the aggravated murder offense for sentencing (*id.*, PageID #1115), and Mr. Shepard received a sentence of life in prison with parole eligibility in 33 years (*id.*, PageID #1128).

**D. Direct Appeal**

Through counsel, Mr. Shepard appealed his conviction and raised three assignments of error challenging the sufficiency and manifest weight of the evidence and challenging the admissibility of hearsay testimony. (ECF No. 8-1, PageID #98.) In a reasoned opinion, the State appellate court overruled each assignment of error and affirmed the conviction and sentence. (*Id.*, PageID #219.) Mr. Shepard timely filed a notice of appeal to the Ohio Supreme Court. (*Id.*, PageID # 240.) In his memorandum in support of jurisdiction, Mr. Shepard, through counsel, raised two assignments of error: one relating to the introduction of bad acts evidence to establish a complicity theory, and the other involving the sufficiency of the evidence. (*Id.*, PageID #182.) The Ohio Supreme Court declined review. (*Id.*, PageID #220.) However, three justices dissented, expressing concern that the jury may have "fill[ed] in the gaps with guesswork" and that the State may not have proved Mr. Shepard's guilt beyond a reasonable doubt. (*Id.*, ¶¶ 4 & 7–8, PageID #222–23.) Further, the dissent expressed "concerned that speculation in this case has been mistaken for

circumstantial evidence and that Shepard has received a life sentence based solely on that speculation." (*Id.*, ¶¶ 7 & 11, PageID #223.) Mr. Shepard sought reconsideration (*id.*, PageID #224), which the Ohio Supreme Court *sua sponte* struck as untimely (*id.*, PageID #230).

### E. Habeas Petition

On May 12, 2025, Mr. Shepard, through counsel, filed a petition for writ of habeas corpus. (ECF No. 1.) His petition asserts three grounds for relief: (1) the admission of out-of-court testimonial statements violated his rights under the Sixth and Fourteenth Amendments; (2) the admission of other acts evidence committed by unindicted persons violated his Fifth, Sixth, and Fourteenth Amendment rights; and (3) his conviction is not supported by sufficient evidence. (ECF No. 1, PageID #6–9; *see* ECF No. 1-2.)

Under Local Rule 72.2, the case was referred to a Magistrate Judge who issued a report and recommendation. (ECF No. 2; ECF No. 13.) The Magistrate Judge recommends that the Court dismiss grounds one and two as procedurally defaulted. (ECF No. 13, PageID #1179.) However, "[o]ut of an abundance of caution," the Magistrate Judge addressed each claim on the merits as well. (*Id.*) The Magistrate Judge recommends that all three grounds be denied on the merits. (ECF No. 13.) Further, the Magistrate Judge recommends issuing a certificate of appealability for each. (*Id.*) Petitioner timely asserted four objections to the Magistrate Judge's report and recommendation. (ECF No. 20, PageID #1252–59.) Respondent objects to the Magistrate Judge's recommendation that the Court grant certificates of appealability for each of Petitioner's grounds for relief. (ECF No. 17, PageID #1209.)

## STANDARD OF REVIEW

A district court judge may designate a Magistrate Judge to submit "proposed findings of fact and recommendations for the disposition, by a judge of the court," 28 U.S.C. § 636(b)(1)(B), of a petition for a writ of habeas corpus, which the Court does by Local Rule 72.2. When reviewing a report and recommendation, if a party objects within the allotted time, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which the objection is made." 28 U.S.C. § 636(b)(1)(C); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). "Objections must be specific, not general" and should direct the Court's attention to a particular dispute. *Howard v. Secretary of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985).

Upon review, the court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Importantly, the Court's job is not to conduct a free-wheeling examination of the entire report and recommendation, but only to address any specific objections that a party has advanced to some identified portion of it. Accordingly, it is the Court's task in this matter to review the Magistrate Judge's report and recommendation de novo, based on the specific objections that the parties raised.

## STANDARD FOR A WRIT OF HABEAS CORPUS

Where a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States," he is entitled to a writ of habeas corpus. 28 U.S.C. §§ 2241(c)(3) & 2254(a). The writ tests the fundamental fairness of State court proceedings resulting in the deprivation of an individual's liberty. *See, e.g., Brown v. Allen*, 344 U.S. 443, 463 (1953); *Powell v. Collins*, 332 F.3d 376, 388 (6th Cir. 2003) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000). 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"With the AEDPA, Congress limited the source of law for habeas relief to cases decided by the United States Supreme Court." *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A State court adjudication is "contrary to" Supreme Court precedent under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams*, 529 U.S. at 405. "Avoiding these pitfalls does

not require citation of [Supreme Court] cases—indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Under Section 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Williams*, 529 U.S. at 410). A State court adjudication involves "an unreasonable application of" Supreme Court precedent under Section 2254(d)(1) in one of two ways: (1) if the State court identifies the correct governing legal rule from the Supreme Court's cases[,] but unreasonably applies it to the facts of the particular State prisoner's case; or (2) if the State court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *See Williams*, 529 U.S. at 407.

## ANALYSIS

Petitioner raises three grounds for relief: "(1) the trial court violated his rights under the Confrontation Clause of the Sixth Amendment; (2) the trial court admitted evidence of unrelated criminal acts allegedly committed by other unindicted individuals in violation of his due process rights; and (3) his conviction was based on legally insufficient evidence." (ECF No. 13, PageID #1175-76.) The Magistrate Judge recommends dismissal of the petition. (*Id*, PageID #1159.) The Magistrate Judge concludes that Petitioner procedurally defaulted his first two grounds because "while he raised those claims in his appeal to the Eighth Appellate District, he argued them

purely as questions of state law." (*Id.*, PageID #1176.) On the merits of grounds one and two, the Magistrate Judge finds that the intermediate State appellate court did not act contrary to or unreasonably apply clearly established federal constitutional law. (*Id.*, PageID #1181; *id.*, PageID #1190.) Also, the Magistrate determined that the State appellate court did not unreasonably adjudicate Petitioner's challenge to the sufficiency of the evidence. (*Id.*, PageID #1196–97.)

## I. Procedural Default (Grounds One and Two)

As a general rule, a petitioner must demonstrate that he has "exhaust[ed] all available opportunities to pursue his claim in state court." *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 826–27 (6th Cir. 2019); 28 U.S.C. § 2254. A federal court may not consider a habeas petition unless and until a State prisoner has presented his claims to each of the State's established appellate courts in accordance with their procedural rules. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Shinn v. Ramirez*, 596 U.S. 366, 371 (2022).

Procedural default is related to exhaustion but ultimately a distinct concept. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Rather than determining whether a claim was presented at each stage of the State court review process, a procedural default determination asks whether a claim was fairly presented as a federal constitutional issue. *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010); *Williams*, 460 F.3d at 806. A habeas petitioner procedurally defaults where he fails to (1) "comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim"; or (2) "fairly raise that claim before the state courts while state remedies were still available." *Wainwright*

*v. Sykes*, 433 U.S. 72, 80, 84–87 (1977); *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Williams*, 460 F.3d at 806.

Procedural default may be excused where a petitioner can show "cause for the default" and the alleged constitutional violation resulted in actual prejudice. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). Or a petitioner can show that "failure to consider the claim will result in a fundamental miscarriage of justice," which occurs where new reliable evidence would establish actual innocence. *Id.*

Notwithstanding excuse for procedural default, a federal court may only consider a habeas petitioner's claim if it was fairly presented to the State appellate courts for review. *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 751 (6th Cir. 2021) (internal citations omitted). "To determine whether a petitioner has fairly presented a claim in state court, [a court] ask[s] whether the petitioner: (1) relied upon federal cases employing constitutional analysis; (2) relied upon state cases employing federal constitutional analysis; (3) phrased the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleged facts well within the mainstream of constitutional law." *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).

The Magistrate Judge determined that Petitioner procedurally defaulted two of his three grounds for relief: the admission of out-of-court testimonial statements violated his rights under Confrontation Clause of the Sixth Amendment (ground one); and the admission of other acts evidence committed by unindicted persons violated

his Fifth, Sixth, and Fourteenth Amendment rights (ground two). (ECF No. 13, PageID #1179.) In making this recommendation, the Magistrate Judge determined that Mr. Shepard's general references to constitutional principles did not outweigh his use of state opinions that relied on state evidentiary analysis. (*Id.*, PageID #1178.) Further, the Magistrate Judge determined that Mr. Shepard's use of state case law that dealt with the Confrontation Clause was not done so for constitutional examination. (*Id.*) Rather, the Magistrate Judge determined that the state law cases that implicated the Confrontation Clause were cited for the proposition that the testimony provided at trial was inadmissible hearsay. (*Id.*)

Petitioner objects to this recommendation, arguing that he: (1) relied on State cases employing constitutional analysis; (2) phrased his claims on direct appeal in terms sufficiently particular to allege a denial of a specific constitutional right; and (3) alleged facts well within the mainstream of constitutional law. (ECF No. 20, PageID #1252–55.)

### I.A. Reliance on State Cases Using Federal Analysis

In his objection to the Magistrate Judge's report and recommendation, Petitioner argues that he raised the claims in his first and second grounds for relief on direct appeal and "relied upon state cases employing federal constitutional analysis." (ECF No. 20, PageID #1252.) Additionally, he maintains that he phrased his arguments on direct appeal "in terms sufficiently particular to allege a denial of a specific constitutional right and alleged facts well within the mainstream of constitutional law." (*Id.*, PageID #1254.)

Petitioner points to three State court cases on which he relied in his direct appeal. (*Id.*, PageID #1252.) Specifically, Petitioner points to *State v. Ricks*, 136 Ohio St. 3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, *State v. Thomas*, 61 Ohio St. 2d 223, 400 N.E.2d 401 (1980), and *State v. Humphrey*, 2008-Ohio-6302 (Ohio Ct. App. Dec. 4, 2008). (ECF No. 20, PageID #1252.) These cases do employ federal constitutional analysis. However, Petitioner did not rely on these cases for that analysis.

On direct appeal, Petitioner relied on *Ricks* (which cited *Humphrey*) primarily to address a hearsay argument under State evidentiary rules, not to raise a challenge under the Confrontation Clause. (ECF No. 8-1, PageID #127–28.) He did not cite *Thomas* directly but rather cited cases that in turn cited *Thomas*. (*Id.*, PageID #126–27.) And he cited *Humphrey* to support his evidentiary argument, not to raise an issue under the Confrontation Clause. (*Id.*, PageID #127.) Petitioner's citation of these authorities does not fairly raise or present to the State courts an argument under the Confrontation Clause. Indeed, Petitioner relied on these authorities to make an argument under State evidentiary rules, not the Confrontation Clause, and his reliance on these cases in the State appellate court is too far removed to raise the ground for relief on which he proceeds here. *See Blackmon v. Booker*, 394 F.3d 399, 401 (6th Cir. 2004) (holding that a claim was procedurally defaulted where secondary citations to federal cases were used to support State-based evidentiary claims). In short, Petitioner used these cases to make arguments under State law, not to raise or develop the federal constitutional claim on which he now proceeds.

### I.B. Particularity of a Specific Constitutional Right

Next, Petitioner argues that his claims were sufficiently particular to allege the denial of a specific constitutional right. (ECF No. 20, PageID # 1254–55.) In support of this argument, Petitioner relies on his third assignment of error on direct appeal. (*Id.*) In that assignment of error, Petitioner alleges a denial of due process in violation of his federal constitutional rights. (*Id.*; ECF No. 8-1, PageID #90 & #123.) Also, he directs the Court to his citation of the Fourteenth Amendment in the table of contents of his appellate brief. (ECF No. 20, PageID # 1254–55 (citing ECF No. 8-1, PageID #97).)

On direct appeal, Petition did cite the Fourteenth Amendment in the table of contents of his brief, and his third assignment of error alleges a deprivation "of due process and a fair trial." (ECF No. 8-1, PageID #97–98 & #123.) But these references are too broad sufficiently to raise the specific constitutional claim at issue and to present it to the State courts for adjudication. "While a petitioner need not cite 'chapter and verse' of constitutional law, 'general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated.'" *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (quoting *Blackmon*, 394 F.3d at 400 (cleaned up)).

With respect to a violation of his federal constitutional rights, Petitioner's assignment of error was "a generalized catch-all phrase[,] which merely alleged the deprivation of a fair trial under the United States Constitution." *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987). Specifically, Petitioner argued that he was deprived of due process and a fair trial because the State introduced "inadmissible

hearsay testimony from the witnesses." (ECF No. 20, PageID #1254.) "Such a catch-all provision does not adequately apprise the state courts of the constitutional theory to be relied upon at appellate review, especially under circumstances where the only legal theory presented to the state courts was predicated entirely upon state evidentiary law." *Rose*, 811 F.2d at 326. A claimed error premised on State evidentiary rulings does not fairly present a federal claim to the State courts, even where a petitioner refers to the federal Constitution. *Spence v. Sheets*, 675 F. Supp. 2d 792, 806 (S.D. Ohio 2009). For these reasons, Petitioner did not adequately raise a constitutional issue on direct appeal.

### I.C. Facts Within the Mainstream of Constitutional Law

Petitioner argues that the facts raised in his direct appeal fall well within the mainstream of constitutional law. (ECF No. 20, PageID #1254–55.) Specifically, he maintains that the testimony given by a detective connecting Mr. Shepard to Bilal and Greathouse was inadmissible hearsay that violated his confrontation rights as guaranteed through the Fourteenth Amendment. (ECF No. 20, PageID #1255.) Facts are considered to be within the mainstream of constitutional law if the "'assertion of the claim' was made 'in terms so particular as to call to mind a specific right protected by the Constitution' and whether the 'allegation of [the] pattern of facts' was 'well within the mainstream of constitutional litigation.'" *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 752 (6th Cir. 2021) (quoting *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)). In such a case, a petitioner fairly presents his claim to the State courts such that procedural default does not bar habeas review.

Here, Petitioner's appeal in State court to due process and the right to a fair trial are so general that they do not, on the facts presented, place confrontation rights at issue or provide notice to the State courts that he intended to raise such a claim. Due process and the right to a fair trial include many fundamental rights beyond confrontation. A generalized appeal based on these claims does not suffice to invoke a federal constitutional claim based on the Confrontation Clause. Indeed, Petitioner did not use the language of confrontation or present the facts in such a way as to invoke this specific right. While hearsay can in some circumstances implicate confrontation rights, in others it does not, and Petitioner argued his assignment of error on direct appeal based on Ohio's evidentiary rules without reference to confrontation. Consequently, Petitioner did not raise a federal constitutional question on direct appeal.

* * *

Finally, Petitioner cannot overcome this procedural default. He has not shown that a factor external to his defense, which cannot be attributed to him, caused the failure to raise the issue on direct appeal or that his claim rests on new evidence of actual innocence. *Coleman*, 501 U.S. at 750. Without such showing, the first and second grounds in Petitioner's habeas petition are procedurally defaulted. Therefore, the Court need not address Petitioner's objections to the merits of either asserted ground for relief.

## II. Sufficiency of the Evidence (Ground Three)

The Magistrate Judge recommends that the Court deny ground three on the merits under the deference due to the State courts' adjudication under Section

2254(d). (ECF No. 13, PageID #1191.) Petitioner objects, arguing that the State court adjudication is "unreasonable and contains a paradox that must be addressed." (*Id.*, PageID #1258.) Specifically, he asks whether the testimony of the detective connecting Mr. Shepard to Bilal and Greathouse was offered for its truth or to explain the investigation. (*Id.*, PageID #1258.) Overall, Petitioner argues that "[t]he State's case rests solely on speculation that was transformed into circumstantial evidence." (ECF No. 20, PageID #1259.) In the language of a challenge to the sufficiency of the evidence, Petitioner maintains that "there was no direct evidence that Mr. Shepard acted with the required mental state to be found guilty of complicity to commit aggravated murder." (ECF No. 20, PageID #1257.) In this respect, the State courts' adjudication is unreasonable because the State's evidence did not show complicity "beyond a reasonable doubt." (*Id.*, PageID #1259.)

Contrary to Respondent's claim (ECF No. 22, PageID #1275), Petitioner presented this claim based on the insufficiency of the evidence to establish complicity both on direct appeal (ECF No. 8-1, PageID #98 & #110–13) and to the Ohio Supreme Court (*id.*, PageID #182 & #187–88). Therefore, he has raised and preserved this issue for habeas review. However, in support of his objection, Petitioner directs the court to oral arguments made before the intermediate appellate court on direct appeal. (ECF No. 19.) To the extent Petitioner's addition of oral arguments on direct appeal constitutes an actual or constructive amendment to the original petition, the Court denies such an amendment. Petitioner originally filed the petition in May 2025. (ECF No. 1.) The Magistrate Judge filed her report and recommendation

nearly a year later. (ECF No. 13.) Petitioner had ample time formally to amend his petition and cannot now point to information that was not before the Magistrate Judge. Therefore, the Court disregards the oral argument in addressing Petitioner's objections.

### II.A. Standard on Habeas Review

Challenges to a conviction in State court based on the sufficiency of the evidence are properly cognizable in a federal habeas corpus petition. *See Jackson v. Virginia*, 443 U.S. 307, 321 (1979). Review of such a challenge involves "a double layer of deference[.]" *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). "First, [a court] must view the evidence in the light most favorable to the prosecution, and determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Mathis v. Colson*, 528 F. App'x 470, 476 (6th Cir. 2013) (quoting *Jackson*, 443 U.S. at 319). "Second, 'even were [a court] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [a court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.'" *Id.* (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

It is not a habeas court's job to "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown*, 567 F.3d at 205. Instead, it is the trier of fact's responsibility to "decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curium). "'[A] reviewing court must consider all of the evidence admitted by the trial court,' regardless of whether that evidence was admitted erroneously."

*McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (quoting *Lockhart v. Nelson*, 48 U.S. 33, 41 (1988)); *see also Sanborn v. Parker*, 629 F.3d 554, 578 (6th Cir. 2010). A habeas petitioner "who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle." *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

**II.B. Sufficiency of the Evidence Under Section 2254(d)**

On the merits, Petitioner's case presents an exceedingly close question, even under the doubly deferential standard for review of a challenge to the sufficiency of the evidence. Viewing the evidence at trial in the light most favorable to the prosecution, including evidence that Petitioner contends was erroneously admitted, leaves a gap in proof. The evidence shows a principal guilty of aggravated murder, but the State, even inferentially and by circumstantial evidence, fails to provide evidence that Mr. Sheperd had the requisite *mens rea* to be guilty of aggravated murder. At most, the prosecution proved that Mr. Sheperd's DNA was on the handle bars of the dirt bike and that he rode it to the scene of the murder, meaning that he lured Jackson to the parking lot where he was shot and killed. But no evidence provides proof that he did so intending that result as opposed to, say, scaring Jackson or arranging for the assailant to recover a debt. All explanations are equally speculative. In short, the trial record simply lacks evidence that Mr. Sheperd had the intent for the intentional killing of Jackson. Accordingly, it is difficult to see how a rational trier of fact could have found Mr. Sheperd guilty beyond a reasonable doubt.

On the second prong of the analysis, Petitioner's argument becomes difficult. On habeas, the Court does not decide a challenge to the sufficiency of the evidence as if on direct appeal. Instead, the standard under Section 2254(d)(1) controls. Therefore, the Court focuses on whether the State courts' adjudication is contrary to or an unreasonable application of clearly established law. In other words, the statute focuses the inquiry not on the *mens rea* for the offense but on the State court adjudication of the sufficiency of the evidence.

On that score, the State intermediate appellate court identified the following circumstantial evidence implicating Mr. Sheperd in the murder: (1) DNA evidence tying Mr. Shepard to the victim's dirt bike, which the State alleged was used to lure the victim to the scene of the murder; (2) video evidence showing an individual, likely Mr. Shepard, riding the bike to the scene of the murder; (3) testimony that the victim asked an unknown individual on the telephone where his bike was shortly before he was murdered; (4) telephone records showing that Mr. Shepard called phone numbers from prison that were connected to a cell phone that also communicated with the victim; (5) the detectives' testimony regarding Bilal and Greathouse, Bilal's potential (though disputed) ownership of the Chrysler, and Mr. Shepard's alleged involvement with both individuals; and (6) surveillance video evidence showing that the rider of the dirt bike appeared to speak to individuals in the Chrysler and to point out the location of the bike. (ECF No. 8-1, PageID #154–55 & #161–66.)

Under the doubly deferential standard, this evidence allows inference upon inference to prove Mr. Shepard's intent for aggravated murder. His connections and

relationship with the person(s) in the Chrysler permits an inference that he acted in concert with them toward the common end of Jackson's murder, though the Court has grave concern about such a finding. In the habeas posture, the difficulty with the analysis of the intermediate State appellate court is that it focused not on this aspect of the sufficiency of the evidence (though Petitioner presented that issue to it) but on whether conviction on a complicity theory requires proof of the identity of the principal. (*Id.*, PageID #167–69.) Its review of the facts in the trial record skipped past Mr. Shepard's *mens rea* (*id.*, PageID #170–71), though the court knew that was the critical inquiry (*id.*, PageID #168). In other words, the State appellate court determined that the jury inferred the requisite state of mind based on inferences drawn from other evidence. Its analysis of the issue comes down to two sentences in its concluding paragraph:

> Viewing the evidence in a light most favorable to the prosecution and giving due deference to the trier of fact on questions of credibility and adequacy, this court does not find that the evidence in this case was insufficient as a matter of law to support the elements of complicity to aggravated murder. This court also does not find that this is the exceptional case where the jury clearly lost its way.

(*Id.*, PageID #172.) Though conclusory and as thin as it gets, this determination embodies an application of clearly established federal law that is not unreasonable, particularly following the State appellate court's discussion of the *mens rea* needed to sustain the conviction. Even under the deference due under Section 2254(d)(1) and the Circuit's jurisprudence, this determination could go either way. The principles of comity, finality, and federalism underlying the statute counsel restraint in reaching a contrary judgment.

## CERTIFICATE OF APPEALABILITY

Without a certificate of appealability, a habeas petitioner cannot appeal a final order in a habeas proceeding. 28 U.S.C.S. § 2253(c)(1). Issuance of a certificate of appealability requires a petitioner to make "a substantial showing of the denial of a constitutional right." 28 U.S.C.S. § 2253(c)(2). This means that the petitioner must show that reasonable jurists would find the district court's determination of the relevant constitutional claims debatable or incorrect. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). The petitioner need not show that the appeal would succeed to be eligible for a certificate of appealability. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

The Magistrate Judge recommends that the Court grant Petitioner a certificate of appealability on all three grounds. (ECF No. 13, PageID #1159–60.) Specifically, she concludes that reasonable jurists could debate Petitioner's "references to federal constitutional law in his [State] appellate brief . . . and the fact that much of the evidence against him came through testimony from detectives and other witnesses that was arguably both speculative and hearsay." (ECF No. 13, PageID #1200.) Respondent objects that because grounds one and two are procedurally barred, "reasonable jurists would agree that they do not deserve encouragement to proceed further." (ECF No. 17, PageID #1213.) Further, Respondent argues that "reasonable jurists would not disagree that Petitioner's claims do not afford relief on the merits," and therefore a certificate of appealability should not be granted. (*Id.*) The Court agrees.

Under Section 2253, Petitioner does not qualify for a certificate of appealability for grounds one and two of the petition. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In these cases, judges should not issue certificates of appealability. *Id.* at 486. Because Petitioner's claims in his first and second grounds are procedurally defaulted, Petitioner is not entitled to a certificate of appealability on those two grounds.

On Petitioner's third ground, the Magistrate Judge mentioned gaps in the evidentiary record such that "a reasonable juror could conclude that the evidence was insufficient as a matter of law to convict Mr. Shepard of complicity." (ECF No. 13, PageID #1196.) Respondent objects that the Court should not issue a certificate of appealability because "the Magistrate Judge did not apply deference under AEDPA." (*Id.*, PageID #1219.) This objection depends on mischaracterizing the record. (ECF No. 17.) Contrary to this assertion, the Magistrate Judge plainly applied the deference due under the AEDPA, and the double deference that applies to a claim for sufficiency of the evidence. (ECF No. 13, PageID #1191–96.) Rather than take the Magistrate Judge's analysis at face value, counsel for Respondent takes a dangerously close turn toward *ad hominem* attacks on the Magistrate Judge. (*See* ECF No. 17, PageID #1220–21.) Such argument is unbecoming the representative of a sovereign.

In any event, reasonable jurists can fairly debate the availability of a writ for Petitioner's third ground on this record. A certificate of appealability requires a "substantial showing of the denial of a constitutional right," a less burdensome standard than what is necessary to issue a writ. 28 U.S.C. § 2253(c)(2). The petitioner must only show that "the issues are debatable among jurists of reasons; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further." *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996). Petitioner's third ground for relief easily meets the standard for a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections (ECF No. 20), **ADOPTS** the Magistrate's Judge's report and recommendation (ECF No. 13), and **DENIES** the petition for a writ of habeas corpus. Further, the Court **SUSTAINS IN PART AND OVERRULES IN PART** Respondent's objections (ECF No. 17). The Court **DECLINES** to issue a certificate of appealability on Petitioner's first and second grounds for relief and **GRANTS** a certificate of appealability on Petitioner's third ground for relief.

**SO ORDERED.**

Dated: November 23, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio